**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA – SOUTH BEND DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | **Civil Action No:** |
| | : | |
| v. | : | |
| | : | **VERIFIED COMPLAINT** |
| NOTRE DAME UNIVERSITY, | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

Plaintiff John Doe[1] ("John" or "Plaintiff"), by and through his undersigned attorneys,

files this Complaint and, in support thereof, alleges as follows:

## I.   NATURE OF THE ACTION

1.      This is an action for declaratory and injunctive relief and for damages arising out

of a decision by Defendant Notre Dame University ("the University") to dismiss John from

school just three weeks before graduation during a difficult moment in his life when he was

experiencing episodic depression including suicidal ideation, and was clearly in need of mental

health resources and formative remedies.  The University did this in response to a vindictive

Title IX proceeding instigated by John's ex-girlfriend (referred to herein as "Jane Roe" and

"Jane") on the basis that she believed John's repeated attempts to reach out to her for support

primarily through texting were harassing and constituted "dating violence."

---

[1]      Plaintiff is contemporaneously filing an Unopposed Motion for Permission to Proceed Under Pseudonym. Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis for his Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way.  Plaintiff also seeks to maintain the privacy rights of his accuser by requesting permission to identify her anonymously as "Jane Roe."

2.      Once the University learned that John had never once threatened Jane, and that John in fact was in danger of harming himself, its primary concern should have been to stabilize and protect John at the same time that it took steps to assist Jane.  In fact, the University was obligated under the Americans with Disabilities Act and by official guidance from the Department of Education's Office for Civil Rights to take certain affirmative steps to protect John.[2]  It did not.   Instead, the University unleashed its prosecutorial Title IX apparatus, labeled John's conduct "sexual harassment," and thrust him into a disciplinary proceeding that placed his entire academic career on trial at the very moment he was struggling with thoughts of suicide and depression.  The University's investigation, hearing and appeal procedures were rife with procedural flaws, lack of due process and inherent gender bias, designed to ensure that male students accused of any type of sexual misconduct or harassment—concepts that do not apply to John's conduct—are found responsible.

3.      The University's grossly inappropriate reaction is only understandable as part of its institutional response to intense recent public scrutiny and multiple federal investigations brought on by female students accusing the University of failing to address incidents of campus sexual assault and sexual harassment against women.  The University's institutional response to these criticisms was to enact a systemic policy of rough justice with accused male students like

---

[2]      The Department of Education's Office for Civil Rights (OCR) has made clear that where a student's actual or threatened behavior is the product of mental health issues that qualify as a legal disability—but the student remains able to meet the academic and other requirements of college life—disability discrimination laws **prohibit** the school from requiring the student to withdraw unless the student presents a "direct threat" to himself or others. Moreover, this "direct threat" standard requires a **"high probability of substantial harm,"** which must be "based on a reasonable medical judgment relying on the most current medical knowledge or the best available objective evidence," and the student must be afforded an opportunity to challenge the school's "direct threat" determination, even in cases of "immediate concern." *See* Letter from Sheralyn Goldbecker, U.S. Dep't of Educ., OCR, to Kent Chabotar, President, Guilford Coll., 26 NAT'L DISABILITY L. RPTR. 113 (March 6, 2003); Letter from Rhonda Bowman, OCR, to Lee Snyder, President, Bluffton Univ., Complaint No. 15-04-2042 (Dec. 22, 2004); Letter from Michael E. Gallagher, OCR, to Jean Scott, President, Marietta Coll., 31 NAT'L DISABILITY L. RPTR. 23 (July 26, 2005); *see also* Barbara A. Lee & Gail E. Abbey, College and University Students with Mental Disabilities: Legal and Policy Issues, 34 J.C. & U.L. 349 (2008).

John, treating them harshly and doling out punishments that far exceed the gravity of the alleged offenses.

4.      The University's numerous procedural failures in John's case included: failing to adequately investigate Jane's allegations; ignoring John's repeated requests during the investigation for information concerning what he had been accused of; failing to provide John with resources promised to accused students in University disciplinary proceedings; allowing Jane to make repeated demonstrably untrue complaints that John had violated the University's No-Contact Order in an attempt to harass John—even having him pulled from class by University police only to be released when witnesses came forward on John's behalf to dispute Jane's false claims; permitting Jane to "dump" more than a thousand pages of documents and a litany of new accusations on John just days before the hearing and to raise entirely new and undisclosed allegations at the disciplinary hearing; unreasonably precluding John from presenting exculpatory evidence at the hearing and further ignoring any exculpatory evidence John was able to introduce.

5.      In its zeal to vigorously respond to any and all complaints by female students, the University even unreasonably ignored newly discovered **video evidence** of Jane admitting to using the Title IX procedures to pursue a personal vendetta against John, as well as evidence of substantial witness tampering by Jane.  The videos submitted to the University included Jane stating that her purpose in pursuing a Title IX complaint against John was to "destroy" his reputation.  John also submitted sworn statements from individuals who stated they would have testified in John's defense, but were dissuaded from doing so based on false representations and coercion from Jane and her friends.  John presented these facts as part of an appeal of the

Hearing Panel's initial decision.  The University deemed this deeply troubling new evidence irrelevant, and denied his request for reconsideration.

6.      To make matters worse for John—a depressed student struggling with thoughts of suicide—the University affirmatively interfered in the therapeutic relationship between John and the psychologist with whom had he had been treating through the University's Counseling Center.  John's therapist submitted a letter on his behalf during the disciplinary proceeding that described the progress John had made in counseling and his commitment to ceasing all contact with Jane.  For these efforts, the University admonished John's psychologist and made clear that the University Counseling Center was never again to advocate for male students accused of sexual misconduct.

7.      The University determined that John's text messages concerning his suicidal thoughts and repeated attempts to contact Jane for help violated its Standards of Conduct, and constituted "stalking," "dating violence," harassment, and "willful damage to the psychological well-being of another."  For these transgressions the University took the extreme measure of dismissing John with no guarantee of readmission, which decision became final with just three weeks of his final semester as a graduating senior left to complete.  While the University's sanction provides the *opportunity* to apply for readmission after one year, it provides no assurance he will be readmitted, and little guidance for what criteria may be applied in that decision.  *If* John were to be readmitted after a year, he would have to repeat an entire semester of classes to complete a degree that he is now within days of finishing.

8.      Notably, through counseling John has made significant progress in resolving his depression-related issues; in fact, he has accepted a lucrative job offer with a June start-date. This position is now in jeopardy and may be lost if John is not permitted to complete his

4

coursework, and is instead made to return to the University a year from now to repeat an entire semester.

9.      The University's decision is particularly harsh and unnecessary given that both John and Jane have been attending the University for months since she made her complaint, and have had only minimal incidental contact since the moment Jane made her Complaint in November of last year.  There has been no recurrence of any conduct that formed the basis of Jane's complaint, and no reason to believe that there will be.  Given John's progress with counseling, confirmed by a University psychologist, it is clear that allowing John to remain a student for the few days necessary to complete his coursework and take final exams presents no danger to anyone.  Indeed, the timing of the University's sanction given John's status as a graduating senior demonstrates that University's decision is purely punitive and motivated by gender bias as opposed to being driven by concern for the safety and needs of its students.  The only result from the imposition of the University's punitive sanction will be to harm John's future economic prospects, and to destroy his reputation.

10.      For these reasons, John brings this action to obtain injunctive and declaratory relief and monetary damages based on causes of action under the Title IX of the Education Amendment of 1972, Americans with Disabilities Act, the Rehabilitation Act of 1973, and for breach of contract, estoppel, negligence and negligent infliction of emotional distress.

## II.    THE PARTIES

11.      Plaintiff John Doe is a natural person who resides in the state of Georgia.  During the events described herein, John was enrolled as a full-time, tuition-paying, undergraduate student at the University.

12.      Defendant University is a leading coeducational, research university located in Notre Dame, Indiana.

13.     At all times material hereto, the University acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of the University's business, mission and/or affairs.

## III.     JURISDICTION AND VENUE

14.     This Court has original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and 28 U.S.C. § 1331, the Americans with Disabilities Act, 42 U.S.C. § 12181 *et. seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, and jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

15.     This Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

16.     Venue is proper in the Northern District of Indiana pursuant to 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to John's claim occurred in the Northern District of Indiana and because the University resides in St. Joseph's County.

## IV.     FACTUAL ALLEGATIONS

### A.     John's University Career and Employment Opportunities

17.     John is a University senior and a candidate for a degree from the Mendoza College of Business.  John has fulfilled all requirements for graduation other than taking two final exams set to begin on May 8th—which he is willing to take off-campus.

18.     John has been an exemplary student, actively involved in academic and philanthropic endeavors both on and off campus and has received university grants for

entrepreneurial pursuits with the business college.  Before the instant dispute, John had no student disciplinary record.  John has been admitted to the political science honor society (Pi Sigma Alpha), and has been active in student organizations.  John also volunteers and acts as an officer for a notable non-profit organization focused on consumer advocacy for economically disadvantaged individuals.  Through his involvement with that organization he has contributed more than 1,500 hours of community service while at the University.

19.     Based on his academic and professional achievements, John has successfully obtained an offer of employment with a financial firm, with the potential to earn six figures through salary and bonus.

**B.     John's Relationship with Jane**

20.     John and Jane were engaged in an intimate but tumultuous relationship for more than a year, beginning in the fall of 2015.  As is typical of young relationships, the two would intermittently break-up and make-up, often in dramatic fashion.

21.     Jane frequently provoked fights with John and actively created significant strife among John's core group of college friends, many of whom believed Jane was emotionally unstable and abusive toward John.  These observations were consistent with Jane's history of interpersonal difficulties.  For example, she was forced to switch roommates multiple times throughout her college career because of personal conflicts.

22.     In June of 2016, John developed serious depression and struggled with suicidal ideation after experiencing the suicide of a colleague with whom he had become close during a summer internship with a company in New York.  As John's depression worsened, so did his relationship with Jane.  John often called on Jane with thoughts of suicide after particularly heated disagreements or threatened breakups, which Jane understandably felt ill-equipped to handle.  Notably, John only threatened to harm himself and never once threatened Jane or placed

her in fear for her own physical safety. Nevertheless, throughout this time of worsening depression for John, he and Jane remained close, continued to be intimate and romantically involved, continued to engage in normal dating behavior including dinner dates, attending sporting events and family get-togethers, and working together on school projects in their shared major.

23.     Jane also experienced frequent bouts of depression during their relationship and often discussed her own thoughts of suicide with John. In fact, John maintained throughout the ensuing disciplinary proceedings that Jane directed threats of suicide to John—the very same conduct she accused of John. Their relationship was punctuated by co-dependent patterns in which each would experience depression and emotional instability and the other would attempt to act as a source of support.

24.     On November 27, 2016, John sent a text message to Jane that he intended to convey a break-up message, which was admittedly poorly worded and misconstrued by Jane as a suicide note. After sending this message, John locked his phone in a cell phone charging locker at the University library for several hours while he focused on studies. Unfortunately, Jane misunderstood John's intent, feared the worst, and began contacting university police as well as members of John's family in an attempt to locate and confirm John's safety.

25.     Hours later, Jane learned the true intent of John's message—that John was breaking up with her. Jane became irate and disposed of any remaining sympathy for John's well-being. From that point on, Jane became singularly fixated on exacting revenge on John. And she did so with the help of the University's Title IX office, trained to view her as a victim and to ignore the obvious needs of male students like John.

26.     The next day, on November 28, 2016, Jane filed a complaint with the University based on John's behavior and threats of suicide.  Rather than recognize the needs of a suicidally depressed student, the University placed her complaint in the category of its "Sexual Assault, Sexual Misconduct, Dating Violence, Domestic Violence, Stalking, and/or Hostile Environment Policies" ("the Policies").

27.     Immediately, on November 29, 2016 the University issued a "No-Contact Order" to John, preventing him from having any contact with Jane during the pendency of the University's investigation.  The Order made allowance for "incidental contact" to the extent both had legitimate reasons to be in the same area of campus, in which case both were to make every effort to minimize their interactions.

28.     John took immediate steps to abide by the No-Contact order and minimize even the chance for incidental contact with Jane, including moving out of his apartment in order to live in a new building on the opposite side of campus from where Jane resided, and agreeing not to enter specific buildings where both had classes for any reason other than to attend class.  In addition, John took the affirmative step of regularly seeing a therapist to address the depression and suicidal ideation that formed the basis of the behavior at issue in Jane's complaint.  John also offered (through counsel) to Jane and the University to agree to any other reasonably practical restrictions on his ability to access University facilities or other locations that Jane might designate—an offer that Jane rejected.

29.     John also adopted the protective measure of walking with a friend when traveling about campus, to ensure that there would always be a witness to any incidental and unintentional contact with Jane while on campus—accurately predicting that Jane's level of vindictiveness toward John would prompt her to make false allegations of violations of the No-Contact Order.

30.     In response to receiving the No-Contact Order, John also immediately deleted Jane's contact information and text messages from his phone so that he would not be able to reach out to her, inadvertently or in a moment of emotional weakness.

31.     Unfortunately, in doing so, John lost all of his saved text communications with Jane, which would turn out to be critical evidence in the ensuing University disciplinary proceedings.  Despite bringing his phone to a forensic IT consultant, John was unable to recover his text history with Jane.  As described in further detail below, once Jane understood that she controlled the universe of text messages between herself and John, she selectively produced excerpts of text message chains, which were carefully curated to depict John in the most negative light possible, omitting all instances of provocation or similarly threatening statements made by Jane.

32.     The extent of Jane's desire to prevent the entire history of her communications with John, and specifically her text messages, from coming to light became clear when she filed and later moved to dismiss a Petition for a Protection Order that she brought against John in the St. Joseph's Circuit Court based on the same alleged conduct that formed the basis of her University complaint.

33.     In opposing the state court petition, John issued discovery requests to Jane seeking all text messages between them.  After Jane refused to respond to John's valid discovery requests, John filed a motion to compel.

34.     In response, Jane filed a motion to **voluntarily dismiss her own petition**, and opposed John's motion to compel their text communications as moot.  This action revealed not only the lengths Jane would go to avoid disclosure of her texts, but also that her alleged fear and concern for her own safety was mere pretense.

35.     The Circuit Court allowed Jane to withdraw her Petition, but ordered her to

*permanently* maintain her text messages.  Once John is able to obtain those communications,

which the University should have required Jane to produce in full, the complete history of Jane's

communications will be laid bare and will demonstrate the extent of Jane's active participation in

the very conduct she has alleged in her various complaints against John.

   **C.     The University's Sexual Misconduct Policy and Student Conduct Hearing
         Procedures**

      **1.     The University's Sexual and Discriminatory Harassment Policy**

36.     At the time of Jane Roe's complaint against John in late 2016, the University's

Policy on Sexual and Discriminatory Harassment (the "Policy") supplied the definitions of

sexual and discriminatory harassment that were applied to the charges Jane brought.

37.     The University incorporates the definitions and terms of the Policy in its student

handbook, *du Lac: A Guide to Student Life* ("the Guide").  The Guide notes that the standards of

conduct, policies, procedures and regulations described in this web-based student

handbook apply to all students.

38.     The Guide details the procedures that apply to investigations and hearings on

allegations covered by the Policy, including sexual assault, sexual misconduct, dating violence,

domestic violence, stalking, and conduct that creates a hostile environment.

39.     The Guide also includes an articulation of certain "actions and behaviors that are

clearly inconsistent with the University's expectations for membership in this community,"

including "[a]busive or harassing behavior, including unwelcome communication" and "[w]illful

damage to the reputation or psychological well-being of another[.]"

40.     The Policy defines "stalking" as "knowingly or intentionally engaging in a course

of conduct involving repeated or continuing harassment of another person that would cause a

11

reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the individual to feel terrorized, frightened, intimidated, or threatened."

41.     The Policy defines "dating violence" as "physical violence or the threat of physical violence committed by a person who is or has been in a social relationship or a romantic or intimate nature with an individual, and the existence of such a relationship shall be determined based on factors such as the length and type of relationship, and frequency of interaction between the persons involved."

42.     The Policy also sets forth a non-exhaustive list of "other sexual misconduct offenses," thereby allowing the University to unilaterally designate conduct as an "offense" falling within "other sexual misconduct" without actually providing notice that the conduct was prohibited.

43.     The Policy also lists a number of educational programs that the University provides to all incoming students and new faculty and staff, including, *inter alia*, "information about existing counseling, health, mental heath, victim advocacy, legal assistance, student financial aid, and other services available **for student and employee *_complainants_** both on-campus and in the community[.]" (emphasis added).

44.     Notably, The University's list of educational programs does not include information about support programs for the mental health or counseling of students *_accused_* of violating the Policy. Rather, the Policy focuses entirely on the protection of complainants without consideration for the potential impact or psychological issues of accused students.

45.     However, the University's web-page does provide "Crisis Services" which are intended to address, among other things, "Suicide Prevention and Coping Resources." (http://ucc.nd.edu/emergency-services/suicide-prevention-and-coping-resources).

46.     None of these institutional resources were brought to bear on John's behalf. Instead, only Jane was or could be viewed as a "victim" within the University's routenized Title IX response to female complaints of harassment.

47.     **The University Conduct Process**

48.     The Office for Community Standards administers the University's Conduct Process for University students and staff and oversees the investigation of alleged violations of the University's Standards of Conduct**.**

49.     The Guide also outlines the procedures for "an Administrative Hearing for Alleged Violations of the Sexual Assault, Sexual Misconduct, Dating Violence, Domestic Violence, Stalking, and/or Hostile Environment Policies (the "Administrative Hearing")."

50.     The University actively provides information "to encourage students" to report incidents of, *inter alia*, dating violence and stalking.

51.     If an incident of sexual assault, sexual misconduct, dating violence, domestic violence, stalking, and/or conduct that creates a hostile environment committed by a student is reported to the University, the Deputy Title IX Coordinator is required to respond to the report, generally by conducting an Administrative Investigation.

52.     The University promises to its students a Conduct Process that provides "**a prompt, fair, and impartial investigation** and resolution of such allegations and will be conducted by University officials who receive annual training on issues related to sexual assault, sexual misconduct, dating violence, domestic violence, stalking, and conduct that creates a hostile environment and on how to conduct an investigation and resolution process that protects the safety of complainants and promotes accountability." (emphasis added).

13

53.     During the pendency of an investigation and any ensuing disciplinary proceedings, the Policy requires the University to provide the complainant and respondent with separate Resource Coordinators, who are instructed to serve as resource persons to identify, explain and navigate the reporting options and the available support services and to provide referrals to counseling, educational support, pastoral care, and medical treatment, and information about University and legal processes.

54.     At the conclusion of the Administrative Investigation, if the Office of Community Standards determines that there is sufficient evidence of a possible violation of the University's rules of conduct, the complainant may choose to pursue the matter through the appropriate University Conduct Process and an Administrative Hearing.

55.     The Policy permits complainants to challenge a determination that the investigation produced insufficient evidence of a possible violation, but does not similarly provide a mechanism for accused students to challenge the investigatory findings.

### 2.      The Administrative Investigation Procedures

56.     The Administrative Investigation procedures require the University through its Title IX office to review statements obtained from the complainant and respondent, conduct interviews of relevant witnesses and review relevant documents.

57.     The Policy further dictates that the complainant and respondent have the opportunities to provide statements and information during the Administrative Investigation. The complainant and respondent may provide a list of possible witnesses, as well as any supporting documents (e.g., text messages, emails, social media, photographs, telephone records, etc.) that they would like to be considered through the investigation.

14

58.     While the Policy permits hearing participants to be accompanied by an advisor during meetings related to the Administrative Investigation, including investigative interviews, the Policy is clear that the advisor's role is "non-speaking."

59.     Notably – the Policy also requires participants to "provide truthful information" and provides that if "an investigation reveals that an individual has provided deliberately false information and/or made an accusation in bad faith or with a view to personal gain or intentionally harming another in connection with an incident, disciplinary action may be taken." As set forth below—the University ignored this requirement and took no action against Jane when it learned that she had supplied false information and abused the Title IX procedures to exact revenge on John—a fact Jane admitted **on video**.

### 3.     The Administrative Hearing Procedures

60.     The University Policy promises students that the "Administrative Hearing is designed to provide **a prompt, fair, and impartial resolution through an equitable process for both the complainant and the respondent**."  (Emphasis added).

61.     The Policy provides that an accused student will receive seven day's notice of the time and location of a hearing, as well as "the nature of the alleged policy violations to be addressed."  In other words, accused students do not learn what their accusers have asserted against them until after the investigation has concluded.

62.     The Policy permits the parties to review, under University supervision, documents and evidence collected or created as part of the investigation, but does not permit parties to make copies or photographs of any evidence.

63.     The Policy also permits parties to have an advisor present at the Administrative Hearing but again makes clear that advisors are prohibited from speaking.

64.     The Policy permits parties to supplement the investigation with additional information by submitting additional documentation at least four days before the Administrative Hearing, in which case the supplemental material must be made available to the opposing party no later than two calendar days before the Hearing.

65.     The parties are permitted to submit questions in writing for the Hearing Panel to consider.  Any questions asked will be "at the sole discretion of the Hearing Panel" and direct communication between the parties is prohibited both before, during and after the Administrative Hearing.

66.     While the Policy permits parties to invite testifying witnesses to the Hearing, the participation of "any witness is at the sole discretion of the Hearing Panel[.]"  Moreover, the Policy expressly prohibits "character witnesses" but does not describe what constitutes character evidence.  As described below, it became clear at the hearing that Hearing Panel members were inadequately trained on this topic and lacked a basic understanding of evidentiary issues surrounding whether evidence of an individual's prior conduct is offered for character as opposed to some other legitimate purpose, such as motive, state-of-mind, bias or credibility.

### 4.     Conduct Case Review Procedures

67.     Students found in violation of University Standards of Conduct from an Administrative Hearing are entitled to request an appeal in a procedure referred to as a "Conduct Case Review."

68.     The Conduct Case Review Board will receive the Administrative Hearing file, including all Administrative Investigation documents.  The Office of Community Standards has the right to provide a response to a request for Case Review, but that response is not required to be shared with the appealing student.

16

69.     The Conduct Case Review Board for Administrative Hearing cases is composed of a panel of three faculty members and administrators selected by the Conduct Case Review Coordinator.  The identities of the Review Board are not required to be shared with the student, and therefore there is no mechanism for students to determine whether board members have conflicts of interest that should preclude their participation.

70.     The Guide limits the grounds for appeal to "i. a procedural defect in the University Conduct Process which would have been substantial enough to have changed the outcome, and/or; ii. the discovery of substantive new information which was unknown or unavailable to the student at the time of the Administrative Hearing and would have had a significant effect on the outcome."

71.     The determination of the Review Board is not required to be explained in any formal written opinion and its decisions are final.

**D.     The Investigation Conducted by the University was Woefully Inadequate and Fundamentally Flawed**

72.      Shortly after learning of Jane's complaint with the University, John met with a representative from the University's Office of Community Standards ostensibly to provide an opportunity for John to learn about the University's administrative hearing process and to ask questions.  John was told virtually nothing about the accusations Jane had made, despite repeatedly asking for the specific conduct he was alleged to have engaged in so that he could begin to prepare a defense and suggest sources of information for University investigators to pursue.

73.     Pursuant to the University's policies, John was also assigned a "Resource Coordinator" who was required to "serve as resource persons to the complainant and respondent to **identify, explain, and navigate** the reporting options and the available support services...

17

[including] referrals to counseling, educational support, pastoral care, medical treatment and **information about University and legal processes**." John attempted to utilize his Resource Coordinator, but found that the University administrator assigned to this task was almost totally unresponsive. John's repeated emails with questions about his rights and the University's processes went unanswered, and John could only obtain minimal guidance by physically going to his coordinator's office and repeatedly requesting to be seen.

74.     In contrast, all University offices and resources were patently responsive to all Jane's requests. For example, when Jane initially complained of John's behavior, he was served with a No-Contact Order by University police within 24 hours; and whenever Jane falsely alleged a violation of the No-Contact Order, University police sprang into action. To date, as discussed below, every complaint John has made against Jane regarding her harassing behavior has been ignored by the University.

75.     John was interviewed by the investigator reviewing Jane's complaint. However, the investigator assigned to John's case was neither fair nor impartial, as required by the Policy. To cite just one example of how biased and unfair the investigation was, John submitted the names of multiple witnesses to the investigator, but made a point to emphasize that two specific witnesses were particularly relevant and should be spoken with immediately. John later learned that the investigator never contacted the two witnesses he specifically advised were critical to disproving Jane's allegations.

76.     In addition, as part of the investigation, it became clear that Jane had submitted partial and incomplete excerpts of longer text message conversations between herself and John to the investigator. For example, text exchanges often began with responses to statements that were not included—making clear there were more to the conversations than presented. John

18

repeatedly pointed out that he was unable to produce complete text chains and that the University should compel Jane to produce complete information. The investigator ignored these requests and permitted Jane to selectively produce only the messages she unilaterally deemed relevant to the proceedings.

77.     Following the completion of the investigation, John was permitted to review (but not copy) a short summary of the investigator's findings, but none of the supporting information forming the basis of those findings. At this point, John was still in the dark about precisely what he had been accused of.

78.     Based on the investigator's deeply skewed and incomplete findings, the University Deputy Title IX Coordinator concluded an Administrative Hearing was warranted, set a hearing date of February 24, 2017, and provided notice to John that for the first time outlined the specific offenses John would face at his hearing. Not having this information sooner was particularly problematic given that John and Jane had been involved in a lengthy relationship. Jane could have been complaining about anything that occurred between the two over the course of more than a year, as opposed to a student accused of sexual assault after a one-night-stand who would have little doubt about the nature of his offense. John was left in the dark throughout the investigation.

79.     Pursuant to the University Policies, John was permitted to review (but not copy) the Administrative Investigation documents gathered by the investigator just seven days in advance of the hearing in a monitored review room made available by the University. The documents consisted of more than 500 pages of material submitted by Jane, including detailed narratives and voluminous but incomplete electronic communication records. This marked the

first time John had the ability to understand the full picture of Jane's specific allegations. He

was given only hours to review this voluminous material and prepare his defense accordingly.

80. John submitted his final position statement to the hearing panel on February 20,

2017. Without access to the primary evidence in this case (text messages), John's statement was

limited to providing evidence in the form of signed witness statements and dinner receipts

establishing generally that John and Jane had continued to be romantically involved and that Jane

often sought out John's company during the specific times that she claimed to have been

harassed by and fearful of John.

81. In addition, John also submitted a letter from his licensed psychologist describing

John's therapeutic progress for consideration by the hearing panel. His psychologist was

employed by the University in its University Counseling Center ("UCC"). His psychologist

stated in her letter that through more than a half-dozen sessions John had "demonstrated

significant growth" and that he had "engaged in counseling appropriately to address mood

concerns and cope with the life stress related to the Title IX investigation." The psychologist

went on to explain that:

> [John] has indicated a clear understanding that his communication
> with his ex-girlfriend in the fall was not a healthy way to seek
> emotional support and has redirected his behavior accordingly,
> seeking and receiving support from family, friends, and the UCC.
> He has indicated a strong desire to avoid contact with his ex-
> girlfriend from the date he officially received the No Contact Order
> on 11/29/16. He has also expressed genuine dismay in counseling
> following each incidental contact with his ex-girlfriend. He was
> visibly shaken on 1/31/17 when he arrived for individual
> counseling following an incidental contact in the St. Liam stairwell
> with his ex-girlfriend as he arrived for his session.

82. According to the assessment of John's therapist, a University-employed

psychologist, John was not a threat to Jane, and he expressed a firm and serious commitment to

avoid all contact with her in the future.

20

83.     The "incidental contact" in the stairwell of the St. Liam building referenced by John's therapist was a result of the UCC scheduling therapy sessions for both John and Jane on the same day at the UCC offices.  Notably, when John encountered Jane in the hallway he kept his head down and said nothing.  **Nevertheless, Jane—while smiling maliciously—began to film John on her cell phone, which she used to make yet another baseless complaint to the University that John had violated his No-Contact Order**.  Jane was never faulted for such conduct by the University.  This only encouraged her to continue to escalate the proceedings by, for example, making additional false allegations against John as the hearing drew closer, as described below.

84.     Pursuant to University Policies, both the Complainant and Respondent are permitted to submit supplemental information to be considered by the hearing panel no later than four days before the hearing, which must then be made available to the other side a minimum of two days before the hearing.  The University permitted Jane to abuse this process by producing roughly 1,000 additional pages of material and making numerous new allegations of abusive conduct, all under the guise of "supplementing" the record.  The "supplemental" material submitted by Jane was literally twice the volume of her initial submission.  This type of evidentiary gamesmanship was permitted by the University despite there being no explanation for why the supplemental material was not submitted earlier—after all, unlike John, she knew the basis for her complaint from the time she made her first complaint almost a month before.

85.     As should have been obvious to the University, Jane did this to prevent John from having adequate time to seek out and obtain evidence that might refute Jane's new allegations.  By allowing Jane to abuse the Hearing process, the University facilitated her efforts in this regard.  Jane's new allegations were in direct response to John's final position statement, and for

the first time included totally implausible claims that Jane had acted affectionately toward John in public settings only because he had threatened her with suicide if she did not.  She also included numerous new allegations of past instances of threatened suicide during their relationship that were not previously disclosed, including demonstrably false claims of having contacted police on multiple occasions, the records of which John could not obtain in time for his hearing.

### E.    The Conduct Hearing

86.    Pursuant to the University Policies, John was not permitted to ask questions of any witness during the proceeding, and while he was permitted to have legal counsel with him, his attorney was not permitted to speak.

87.    John submitted questions to be asked of the complainant and various witnesses in advance of the hearing, many of which were disregarded by the panel.

88.    The Panel actively and aggressively shutdown any questions or statements by John and his witnesses that in any way referenced conduct by Jane, whether it was past instances of her abusive behavior toward John, past threats of suicide made by Jane, or statements attempting to provide context for the message exchanges put at issue by Jane.  All such testimony was incorrectly excluded on the basis of being prohibited "character evidence," regardless of its relevance and that, in fact, it was not character evidence.  The Panel repeatedly admonished John that "Jane was not on trial, he was."  The Panel's behavior toward John in precluding his questions became so aggressive that he stopped making requests for the Panel to ask questions he would have otherwise wanted witnesses to answer.  Clearly, the Hearing Panel considered John's participation a hindrance to a process that was designed to achieve a specific result.

89.     In just one example (of many), a number of witnesses were precluded from describing a group vacation during spring break, which both John and Jane attended, where Jane, became emotionally unstable and combative after heavy drinking and left the group.  When John, at a mutual friend's request, tried to find Jane and make sure she was safe, she falsely accused John of stalking and harassing her to hotel personnel—accusations that the entire group of friends observed to be false.  This was excluded as "character evidence" simply because it concerned Jane, and regardless of the fact that it demonstrated Jane's habitual overreactions and false accusations directed toward John, that she would later retract after cooling off.

90.     Jane also made new allegations at the hearing that were not previously disclosed in her voluminous written statements, asserting for the first time that John had coerced her into having sex by threatening to commit suicide if she did not consent.  John was unable to refute these allegations, in particular because he did not have access to text messages that would show Jane reaching out to John for romantic company or to instigate sexual activity during the relevant period of time where she was supposedly in fear of John.  The Panel declined to draw any inference against Jane for the obviously incomplete text chains she produced.  In fact, the University did not even bother to ask for the missing texts, apparently satisfied that the one-sided portrayal of the events submitted by Jane would be helpful in reaching the desired result—finding against John.

### F.     The Hearing Panel's Decision

91.     The Hearing Panel issued its decision on March 20, 2017.  The Panel's decision was articulated in a fourteen page letter, the majority of which was comprised of text messages between John and Jane—cut and paste from Jane's cherry-picked submissions and without the benefit of the full context of the communications.

23

92.     At the conclusion of its factual findings, the Panel found that John had violated the following University Standards of Conduct: "Stalking; Willful damage to the reputation or psychological well-being of another; Dating Violence; and Abusive or harassing behavior, including unwelcome communication."

93.     As a result of these findings the Panel's decision provided that "you are hereby dismissed from [the University] through the 2017 Fall Semester.  You are provided the opportunity to apply for readmission to the University; however, you will not be eligible for readmission...until the 2018 Spring Semester.  Your permanent academic record shall read 'Dismissal with the Opportunity to Apply for Readmission.'"  The decision goes on to point out that "readmission is not guaranteed" and should he return to campus during the period of dismissal he "may be arrested and charged with criminal trespass."  The decision further requires John to establish a relationship with a licensed psychologist following his dismissal.  John will be required to sign a release permitting his therapist to share information with the University so it can evaluate his readiness to return to academic life.

### G.     The Appellate Process

94.     The Procedures provide for the opportunity for students found in violation of University Standards of Conduct to submit a request for a Case Review based solely on grounds of procedural defects in the hearing process or the discovery of substantive new information. John supplied evidence of both.

95.     John appealed the Panel's decision on the basis of procedural errors that substantially affected the fairness of the process and because the outcome was manifestly contrary to the weight of the information presented.

96.     In addition, the identities of the Review Board Panel are not disclosed to students. As a result, John had no way to determine whether his panel had personal or professional conflicts of interest that should have precluded their participation.

97.     On March 27, 2017, John submitted a written Case Review request, detailing the numerous procedural and substantive errors that marred the underlying proceeding.  With regard to procedural defects, John listed a number of substantial issues, including *inter alia*:

a.     Jane was permitted to present and rely upon new allegations at the Hearing, without providing the required notice to John;

b.     The Panel precluded highly relevant testimony that contextualized many of John's statements and would have mitigated the appearance of the one-sided and selectively excerpted text messages that formed nearly the entire basis for the Panel's decision;

c.     Jane was permitted to drastically alter and augment her allegations against John under the guise of "supplementing" the record, through which she submitted more than 1,000 of pages of material that John would only be permitted to review once, for a few hours, 48 hours in advance of the hearing.

d.     The University permitted Jane to submit unilaterally selected excerpts of text message exchanges with John, and ignored John's requests to compel Jane to provide full text communications to the Panel.  These incomplete text messages were the single most critical pieces of evidence relied on by the Panel in rendering its decision.

98.     John also submitted substantial newly discovered evidence for the Review Board Panel to consider, including:

a.      John obtained a cell phone video taken on February 11, 2017 (in advance of the hearing) by a mutual friend, which clearly shows Jane stating that: "I want to fuck up his [John's] reputation; I want to make sure he never has a girlfriend... here or anywhere...and I want him never to be able to have a social life..."  John did not obtain this evidence before the hearing because the student who filmed it did not disclose its existence until learning that John was dismissed from the University.

b.      John discovered that Jane had used coercion, pressure and false information to induce two witnesses to refrain from coming forward and providing evidence in John's defense.  One of these witnesses was a close friend of Jane's, who sent a text message to John after his hearing stating that she had been "played" by Jane, and asked whether it was too late to help.  This witness explained that she felt morally compelled to come forward when she learned that John had been dismissed from school, a punishment she viewed as unjust based on her knowledge that Jane's accusations were greatly exaggerated.  A second witness signed a sworn affidavit that he had recorded the video evidence of Jane referenced above, but that he was pressured by friends of Jane not to disclose it.

c.      John submitted multiple written witness statements to counter a number of the new allegations made by Jane at the hearing—including accusations concerning John's allegedly violent temper, which Jane supported by describing an incident where John allegedly flipped a bar table in anger.  Witness statements from mutual friends present at the bar on the night Jane described confirmed that Jane's accusation was false.  It is also noteworthy that at the hearing, Jane was

26

permitted to testify about instances of John's conduct, while John's attempts to describe similar incidents of Jane's behavior were excluded as "character evidence." This double standard permeated the University's approach to the entire proceeding.

d.      John obtained a witness statement from his brother who had lengthy discussions with Jane during her periods of concern for John's safety in which Jane explicitly stated she knew John would never hurt her. This was presented in response to a new allegation Jane presented at the hearing that John's behavior made her afraid for her own personal safety.

e.      John pointed out to the Review Panel that he had learned through witness testimony at the hearing that Jane had used an unsigned and unverified draft affidavit to manipulate the Title IX investigator and potential witnesses, by providing individuals with the content of the affidavit and falsely representing it was filed in court as part of her petition for protective order, suggesting that it could be relied upon as an official court document.

99.      In addition to detailing the above procedural errors and new evidence in the statements John submitted in support of his appeal, John also asked his psychologist to submit a letter to the Review Board attesting to the fact that he was fit to attend classes and handle a stressful academic environment. In discussing this request with his psychologist, John learned deeply disturbing information: the Director of the Office of Community Standards (OCS) who presided over John's disciplinary proceeding had contacted the John's psychologist's boss to communicate that he was displeased that UCC had submitted a letter on John's behalf at the Hearing. The Director of OCS instructed that his therapist should never advocate for an accused

student again, unless specifically instructed by the University.  Based on this admonishment

from the University, John's therapist—who was a University employee—was not able to draft a

letter on John's behalf.

100.    In fact, on April 18, 2017 John's psychologist advised that she was required to

terminate their relationship because of a conflict of interest.  Accordingly, the University

effectively stripped John of one of the few resources he was provided.

101.    Jane was permitted to respond to John's appeal, which response John was only

permitted to quickly review, but not copy.  Included among Jane's response to John's appeal was

a highly improper affidavit from Jane's sister who was employed as a Title IX officer with

another college.  The affidavit provided something akin to an expert opinion and represented that

the sister's college would deem expulsion an appropriate sanction for a student engaging in

similar conduct.  John is unaware whether the Review Board found this improper expert affidavit

compelling or persuasive because the Review Board never stated the reasons for its

determination.

102.    On April 13, 2017, the University Review Board rendered its decision in a three-

sentence letter advising that John "did not establish sufficient grounds for a case review," and

that the Hearing Panel's decision is final.

103.    The Review Panel's refusal to even consider the video evidence of Jane explicitly

describing her ulterior and vindictive motives for pursuing John in a Title IX case and her

documented efforts to tamper with witnesses, was particularly egregious.  This later-discovered

evidence demonstrated the importance of obtaining complete text chain conversations, which the

Panel should have required Jane to produce.  The video of Jane's statements also bolster John's

contention that many of her actions were motivated by malice as opposed to fear, including her

many false reports that John had violated the University No-Contact Order.  Such confirmation

of Jane's vindictive motives highlights the importance of the so-called "character evidence" the

Hearing Panel refused to consider, which would have further developed this theme and called

Jane's overall credibility into serious question.

**H.      The University Ignored John's Complaints of Similarly Harassing Behavior
By Jane**

104.    During the investigation and again during the appeal, John reported to the Title IX

office and filed official complaints through the University's "Speak Up" portal of the OCS

website that Jane had directed harassing behavior toward him.  Jane's harassment included her

multiple false allegations of No-Contact Order violations, her recorded statements expressing

that her true motivation in pursuing Title IX charges against John was to "destroy" him, and her

highly improper and successful efforts to intimidate and coerce witnesses from testifying on

John's behalf.

105.    The University failed to acknowledge the majority of John's complaints, and has

yet to respond in any meaningful way to his reports of Jane's harassing behavior during the

proceedings.  The University's disparate treatment of Jane's and John's complaints clearly

demonstrates that only female accusations of harassment are taken seriously by the University.

**I.      The University Has Been Subject to Severe Public Criticism and Multiple
Office for Civil Rights Investigations Concerning Alleged Title IX
Deficiencies in the University's Treatment of Female Students in Sexual
Assault Cases, and Imposed an Overly Harsh Punishment on John to Avoid
Further Public Scrutiny.**

106.    The perception of the existence of significant problems related to the sexual

assault of women on campus gained national attention at the University in 2010, when a 19-year-

old freshman killed herself after reporting that she had been assaulted by a player on the

University's football team.

107.    The Office for Civil Rights (OCR) opened an investigation that was resolved in July of 2011 through an agreement in which the University agreed to modify and strengthen its Title IX reporting, investigation and disciplinary procedures.

108.    The agreement followed closely on the heels of an April 4, 2011, guidance letter issued to all universities by OCR, commonly referred to as the "Dear Colleague Letter."  (Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n. 1, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter")).  The letter provided substantial guidance in the implementation of Title IX procedures, and exerted significant pressure on colleges and universities to revamp their procedures to be more responsive to alleged victims of sexual assault, who are women in the overwhelming majority of cases.

109.    Two additional OCR investigations concerning Title IX issues have since been opened against the University on February 19, 2016, and December 23, 2016.  Both investigations remain open.

110.    Information regarding the February 19, 2016 investigation is not publicly available.

111.    The December 23, 2016 investigation was opened in response to a female undergraduate student's complaint that the University had not promptly and adequately responded to reports of sexual violence.

112.    In addition, the documentary film "The Hunting Ground" was released at the 2015 Sundance Film Festival and received wide notoriety and media attention.  The documentary presents the stories of multiple female students who allege they were sexually assaulted in

college, but ignored by college administrators.  The University was featured prominently in the documentary.

113.    The Hunting Ground, which was later re-aired nationally on CNN, received significant political support.  On February 26, 2015, one day before the theatrical release of the film, a bipartisan group of twelve U.S. Senators, accompanied by the film's lead subjects, introduced legislation addressing safety on college campuses. Other US Senators made public statements predicting significant fallout at universities across the country based on the impact of the film.

114.    Furthermore, several published articles have condemned the University for its handling of sexual assault allegations, including by levying criticism at the University for having procedures that confuse prospective complainants, conducting investigations too slowly, giving preferential treatment to athletes, denying the assistance of local prosecutors in investigating on-campus allegations of sexual assault, and leading Indiana colleges for rapes reported. These news accounts also highlight the Office for Civil Rights' investigation into the University for its handling of sexual harassment complaints. *See* Tyler Kingkade, *Notre Dame, Stung By 'The Hunting Ground,' Is Under U.S. Investigation for Sexual Harassment Cases*, The Huffington Post (Apr. 17, 2015); Kristen Lombardi, *Notre Dame case highlights complexities of campus sexual assault investigations*, The Center for Public Integrity (Jan. 7, 2013); Vivian Nunez, County Prosecutor Pushes For Notre Dame Campus Sexual Assault Cases To Come Through SVU, Generation Progress (May 20, 2015); Aishah Hasnie, *Notre Dame tops list of Indiana colleges for rapes reported*, Fox 59 (June 9, 2016).

115.    The significant media scrutiny has come not in the form of objective news reporting, but instead is told from the perspective of an activist or advocate, leading to increased

pressure on the University to overcorrect any perceived deficiencies in investigating Title IX complaints, further detrimentally affecting the rights of male students accused of sexual assault.

116.    Upon information and belief, the existence of the OCR investigations as well as the significant public scrutiny specific to the University created an atmosphere of institutional hostility toward accused male students and prompted the University to over-correct any perceived deficiencies in its responsiveness to female accusers by minimizing the rights of male students and ensuring that female accuser's complaints would be acted upon and found credible, even in dubious cases such as the allegations leveled at John.

## COUNT I
### (Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.)

117.    Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq*., provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

118.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  The University is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

119.    The University discriminated against John and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased implementation of its Policy on Sexual and Discriminatory Harassment and by imposing an excessively punitive, unjust punishment of "dismissal" from the University as a result of that Policy.

120.    Under Title IX, schools must "[a]dopt and publish grievance procedures providing for the ***prompt and equitable resolution of student . . . complaints*** alleging any action which would be prohibited by [Title IX or its regulations]." 34 C.F.R. § 106.8(b) (emphasis

added).  Both the Department of Education and Department of Justice have set forth this

requirement by way of regulation. *See* 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. §

54.135(b) (Dep't of Justice).

121.    In 2001, the Office for Civil Rights ("OCR") of the Department of Education, the

office that administratively enforces Title IX, promulgated regulations pursuant to notice-and-

comment rulemaking in a document entitled "Revised Sexual Harassment Guidance:

Harassment of Students by School Employees, Other Students, or Third Parties" ("2001

Guidance"). Title IX's regulations, including the 2001 Guidance, have the force and effect of

law, because they affect individual rights and obligations and were the product of note-and-

comment rulemaking.

122.    OCR's 2001 Guidance "identified a number of elements in evaluating whether a

school's grievance procedures are prompt and equitable. . . ." *Id*. at 20. These elements apply to

private and public colleges and universities and include:

- "***Notice to students . . . of the [school's] procedure***";

-  "***Adequate, reliable, and impartial investigation of complaints***, including the
***opportunity to present witnesses and other evidence***";

- "***Designated and reasonably prompt timeframes for the major stages of the***
***complaint process***."

*Id.* (emphasis added).

123.    OCR's 2001 Guidance further stated that "***[a]ccording due process to both***
***parties involved, will lead to sound and supportable decisions***." *Id*. at 22 (emphasis added).

Title IX's "due process" requirement applies to both state and private colleges and universities.

*Id*. at 2, 22.

124.    The University's Policy on Sexual and Discriminatory Harassment as conceived and implemented by the University was deliberately designed to favor the female accuser and disadvantage the accused male by, among other things, eliminating from the process fundamental procedural safeguards for the accused set forth in Title IX.

125.    As set forth in detail above, the Policy on Sexual and Discriminatory Harassment entailed a procedurally deficient process that was deliberately designed to subject male students to less favorable treatment than female students, because accused students in sexual assault cases are overwhelmingly, if not always, male, and the Policy on its face and as implemented in John's case accorded unequal treatment to them.

126.    The Policy was systemically inequitable in practice toward accused students (who are overwhelmingly male). Among the many procedures that unfairly disadvantaged accused male students, the Policy eliminated a full hearing process, in which both parties had an equal opportunity to question and confront each other and witnesses and to present evidence in front of an impartial and independent Hearing Panel.

127.    Accused students were not entitled to notice of the allegations until just days before the hearing.  Although the accuser knew the charges and the substance of her allegations from the beginning of the case, the accused was left in the dark.  In John's case, he only learned the full extent of Jane's allegations when he was permitted—for a few hours and just days before his hearing—to review more than 1,500 pages of material submitted by Jane in support of her complaint.

128.    Even more egregiously, the Hearing Panel found John responsible on the basis of charges Jane raised for the first time at the hearing—including deeply concerning but wholly

34

unsubstantiated allegations that he had coerced Jane into consenting to continue their sexual relationship under threat of committing suicide.

129.    The Investigator and Hearing Panel accepted Jane's account *carte blanche*, finding her story credible, and John's story not credible, on the basis of an obviously incomplete record of text messages that the University did not care to investigate.

130.    The University also provided disparate levels of support to John and Jane during the investigation and hearing phase of the proceedings.  For example, John was assigned a Resource Coordinator who was totally unresponsive to his multiple requests for guidance and information.

131.    The Office of Community Standards also applied a double standard in reviewing and responding to the parties' complaints.  When Jane complained of harassment by John, a No-Contact Order was put in place within 24 hours, and her further complaints of violations of the No-Contact Order were met with swift action by University police.  On the other hand, when John complained of Jane's abuse of the No-Contact Order by making false accusations in order to traumatize and embarrass John—a student undergoing therapy and suffering from known depression and suicidal ideation—the University did nothing.  Similarly, when John complained that Jane actively manipulated witnesses to convince them not to testify, accusations supported by sworn statements from those witnesses, the University again failed to respond.

132.    Similarly, the Hearing Panel exhibited open and obvious preferential treatment of Jane during the Hearing, evident in the manner in which it permitted Jane to testify at length regarding John's behavior toward her throughout the course of their relationship, and at the same time precluding John from testifying at all about Jane's behavior toward him—often admonishing John that only his conduct was on trial.

35

133.    Moreover, the Office of Community Standards bias against John drove it to take the alarming step of interfering with John's relationship with his University-employed psychologist, admonishing her for daring to advocate on behalf of a male student in a sexual misconduct proceeding.  The Office of Community Standards made clear to the supervisor of John's therapist that the University Counseling Center was not to do so again unless specifically requested by the Hearing Panel.

134.    These University officials charged with overseeing the Title IX process applied in this case had actual knowledge and notice of the University violations of Title IX's inherent requirement to provide an "adequate, reliable and impartial investigation" and "due process to both parties involved."

135.    They selectively enforced the University's policies and procedures to treat John (an accused male) differently from Jane by promptly and aggressively responding to Jane's complaints while wholly ignoring John's complaints of similar harassment directed by Jane toward him.

136.    These actions were intended to deliberately treat John (as an accused male) less favorably than Jane (as an accusing female).

137.    These University officials had the authority to stop the wrongdoing.  By doing nothing, they and the University were deliberately indifferent to John and similarly-situated male students charged under the Policy on Sexual and Discriminatory Harassment.

138.    Upon information and belief, statistics within the exclusive possession, custody, and control of The University will show that accused students are overwhelmingly male and their accusers are overwhelmingly female.

36

139.    Upon information and belief, statistics within The University's exclusive possession, custody, and control will show a pattern of intentional discriminatory conduct, including that in the post-August 2015 period, after the revamped Policy on Sexual and Discriminatory Harassment took effect, the Office of Community Standards has invariably charged males accused of sexual misconduct, and the Panel Hearing and Conduct Review proceedings have invariably resulted in affirming the Investigator's findings.

140.    The outcome of The University's flawed proceeding against John was clearly erroneous, and was motivated on the basis of sex. The University's implementation of the Policy was based on archaic assumptions and stereotypical notions of behavior of male and female students – *i.e.*, accused male students are presumed to be aggressors and perpetrators and accusing female students are presumed to be "victims."

141.    The University's conduct was so severe, pervasive, and objectively offensive that it denied John equal access to education that Title IX is designed to protect.

142.    The University punished John with one of its most severe sanctions—dismissal from the University—with little evidence and as a result of a process that contains virtually no procedural safeguards for accused male students and is permeated with gender bias.

143.    As a direct, proximate, and foreseeable consequence of The University's Title IX violations, John has been stripped of his ability to continue his education at The University for a minimum of one year, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and

professional opportunities, loss of future career prospects, and other direct and consequential damages.

144.     As a result of the foregoing, John is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT II
### Discrimination in a Public Accommodation in Violation of the ADA
### 42 U.S.C. § 12181 et. seq.

145.     Plaintiff repeats the allegations of all of the above paragraphs as if fully set forth herein.

146.     As described above, the University's actions and practices—charging Plaintiff with violation of University rules, dismissing him from school, barring him from the University, threatening to arrest him for trespassing if he entered University property, and imposing discriminatory conditions upon his readmission—violate Title III of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. § 12181 et seq.

147.     The University mistakenly believes that John has a mental impairment that substantially limits one or more of his major life activities such that he is otherwise unqualified for attendance at the University.

148.     Defendant's actions and practices described above constitute unlawful discrimination under 42 U.S.C. § 12182(a) and (b), in that Defendant has discriminated against Plaintiff on the basis of Plaintiff's perceived and/or actual disability, with regard to the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations. Defendant's actions and practices described above also constitute unlawful discrimination under the various subparts of 42 U.S.C. § 12182(b)(1)(A), and § 12182(b)(2)(A).

149.    Defendant has excluded Plaintiff from participation in and denied him the opportunity to participate in or benefit from its programs, services and activities based upon fear, speculation and stereotype about his perceived disability. 42 U.S.C.A. § 12102(2)(c).

150.    Defendant has treated Plaintiff unequally compared to students that do not have a disability. Defendant has also used criteria and methods of administration that have the effect of subjecting Plaintiff to discrimination on the basis of his perceived disability, and that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of its program with respect to individuals with disabilities and in particular with respect to Plaintiff.

151.    Additionally, Defendant has failed to provide a reasonable accommodation under the Americans with Disabilities Act that would enable Plaintiff meaningful access to Defendant's services, programs or activities. Defendant's decisions, inter alia, to deny Plaintiff's requests to drop the charges against him, to allow him to return to school, and to dissolve the barring order, amount to a failure to accommodate Plaintiff's disability.

152.    As a result of Defendant's violations of the Americans with Disabilities Act, Plaintiff was damaged, as detailed above.

## COUNT III
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794 et seq.

153.    As described above, the University's actions and practices—charging Plaintiff with violation of University rules, dismissing him from school, barring him from the University, threatening to arrest him for trespassing if he entered University property, and imposing discriminatory conditions upon his readmission—violate Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 et seq. ("Section 504").  In particular, Defendant is a covered

entity for purposes of Section 504 of the Rehabilitation Act because it operates a program or activity receiving federal funds.

154.    Defendant, in its actions and practices described above, have discriminated against Plaintiff, and excluded him from participation in, and denied him the benefits of, Defendant's programs, services and activities because of Plaintiff's perceived disability.

155.    Additionally, Defendant has failed to provide a reasonable accommodation under Section 504 of the Rehabilitation Act that would enable Plaintiff meaningful access to Defendant's services, programs or activities. Defendant's decisions *inter alia* to deny Plaintiff's requests to drop the charges against him, to allow him to return to school and take final exams, and to dissolve the barring order, amount to a failure to accommodate Plaintiff's disability.

156.    As a result of Defendant's violations of Section 504, Plaintiff was damaged, as detailed above.

## COUNT IV
### (Breach of Contract)

157.    The foregoing allegations are incorporated herein by reference.

158.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

159.    At all times relevant hereto, a contractual relationship existed between the University and John through John's matriculation as a student at the University, and through the University's policies and procedures governing the student conduct process, including but not limited to the policies and procedures contained in the Guide as well as the Policy on Sexual and Discriminatory Harassment, in addition to related terms and provisions in bulletins, circulars,

and on-line website information and regulations made available to John  as a tuition-paying student. On his part, John fully performed under his contracts with the University.

160.    The University, through its agents assigned to John's case, was required to act in accordance with the aforementioned policies and procedures in addressing Jane Roe's allegations against John, and in conducting its investigation, Panel Hearing, and Appellate review.

161.    For all the reasons set forth above, the University has materially breached its contracts with John by failing to comply with the aforementioned policies and procedures in the course of its investigation and adjudication of John's case, and by arbitrarily disregarding its contractual duties throughout the proceedings.

162.    Apart from breaching its express contractual obligations, the University breached and violated the covenant of good faith and fair dealing implied in its contracts with John by acting arbitrarily, capriciously, and in bad faith throughout John's student conduct process, by acting in a manner inconsistent with John's reasonable expectations of a fair and impartial process, by depriving him of the benefit of his bargained-for education, and by meting out a grossly disproportionate sanction of dismissal from the University.

163.    As a direct, proximate, and foreseeable consequence of The University's numerous material breaches, John has been stripped of his ability to continue his education at the University, and his academic and career prospects, earning potential, and reputation have been severely and permanently harmed.  He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

164.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT V
### (Estoppel and Reliance)

165.    The foregoing allegations are incorporated herein by reference.

166.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

167.    In the event the Court finds that the promises and representations the University made to John in the aforementioned policies and procedures do not constitute legally valid and enforceable contracts, John pleads in the alternative a claim for equitable estoppel.

168.    The University made an unambiguous promise to John that by enrolling as a student the University would accord him a fair and just process to resolve any allegations of a violation of the University Code of Conduct; John relied on such promise when he made the decision to enroll at the University; John's reliance was expected and foreseeable by the University; and John reasonably and justifiably relied to his detriment on the promise when he was subjected to a process that violated the promise.

169.    As a direct, proximate, and foreseeable consequence of the above-identified conduct, John has been stripped of his ability to continue his education at the University for a minimum of one year, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation,

past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

170.    As a result of the foregoing, John is entitled to specific performance or in the alternative to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT VI
### (Negligence)

171.    The foregoing allegations are incorporated herein by reference.

172.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

173.    The University owed John a duty of reasonable care in selecting, training, and supervising competent and impartial investigators, Hearing Panel members, and Conduct Review Panel members to investigate and decide his case and to ensure that the University's new Policy was fair, impartial, and equitable to both parties.

174.    For all the reasons set forth above the University breached its duties of care owed to John.

175.    As a direct, proximate, and foreseeable consequence of The University's aforementioned conduct, John has been stripped of his ability to continue his education at The University for a minimum of one year, and his academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

176.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

### COUNT VII
**(Negligent Infliction of Emotional Distress)**

177.     The foregoing allegations are incorporated herein by reference.

178.     This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

179.     When the University undertakes to investigate allegations of sexual misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

180.     By participating in the Policy on Sexual and Discriminatory Harassment's investigatory process and adjudication, John reasonably relied upon the University's duty to protect him from harm.

181.     For all the reasons set forth above, the University breached its duties of reasonable care.

182.     As a result, John has suffered physical harm, including severe emotional distress, which includes symptoms of depression, social anxiety, loss of concentration and focus, and feelings of hopelessness. He is no longer able to sleep through the night, and is in a perpetual state of anxiety and physical and emotional exhaustion.

183.     A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

184.    As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs as may be recoverable at law.

## COUNT VII
### (Declaratory Judgment and Injunctive Relief)

185.    The foregoing allegations are incorporated herein by reference.

186.    This Court has original diversity jurisdiction over this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

187.    The University has committed numerous violations of its contractual obligations as set forth above.

188.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to whether the University breached its contracts with John.

189.    By reason of the foregoing, pursuant to 28 U.S.C. § 2201, John requests a declaration that the University breached its contracts with John and subjected him to an invalid process and sanction, and that he is entitled to redress that will make him whole, including but not limited to his immediate reinstatement as a full-time student in good standing, and all rights, privileges, and access to campus facilities and events accorded to students at the University.

190.    John further requests that this Court issue a permanent injunction:  (a) reversing the findings and sanction against John; (b) ordering the University to expunge the findings of responsibility and sanction of dismissal from John's educational record at the University, and to publicly so state; (c) ordering the University to reinstate John as a matriculating student and to accord him all of the rights, privileges, and access to campus facilities and events of a fully enrolled student; and (d) ordering the University to provide a Dean's Statement that shall be

made available to third parties at John's reqeust (such as educational institutions and prospective employers) certifying that the findings and sanction have been reversed and expunged from John's educational record.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a. Declare that the University breached its contract with John;

b. Grant injunctive relief ordering the University to reverse and expunge its findings of responsibility and sanction from John's educational record;

c. Grant injunctive relief ordering the University to reinstate John as a student, and to accord him all of the rights, privileges and access to campus facilities and events of a fully enrolled student in good standing;

d. Grant injunctive relief ordering the University to provide a Dean's Statement that shall be made available to third parties upon John's request (such as educational institutions and prospective employers) certifying that The University has reversed and expunged the findings and sanction;

e. Award John compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

f. Award prejudgment interest;

g. Award attorney fees and costs pursuant to statutory or common law doctrines providing for such award;

h.  Grant such other and further relief that the Court deems just and proper.

Respectfully submitted,

   s/ Peter J. Agostino
Peter J. Agostino                    (#10765-71)
Stephanie L. Nemeth               (#25721-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
Telephone:  (574) 288-1510
Facsimile: (574) 288-1650
Email: nemeth@aaklaw.com
Email: agostino@aaklaw.com

*Attorneys for Plaintiff*

JURY DEMAND

Plaintiff, by counsel, requests a trial by jury of this matter.

   s/ Peter J. Agostino
Peter J. Agostino                    (#10765-71)

47