# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA – SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| | : | |
| Plaintiff, | : | **Civil Action No: 3:17-cv-298** |
| | : | |
| v. | : | |
| | : | |
| NOTRE DAME UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

## BRIEF IN SUPPORT OF PLAINTIFF'S CORRECTED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Peter J. Agostino                (#10765-71)
Stephanie L. Nemeth              (#25721-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
Telephone:  (574) 288-1510
Facsimile: (574) 288-1650
Email: nemeth@aaklaw.com
Email: agostino@aaklaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................ 1

II.   Factual Background ..................................................................................................... 3

III.  Argument ..................................................................................................................... 8

    A.   John is Likely to Succeed on His Title IX and Breach of Contract Claims.................. 9

        1.   John Is Likely to Succeed on His Title IX Claim Because the University
             Treated John, a Male Student, Differently to His Detriment, From Jane Roe,
             Based on His Gender ........................................................................................ 9

        2.   John Is Likely to Succeed on His Breach of Contract Claim ............................. 15

    B.   There is No Other Adequate Remedy at Law for John ................................................ 21

    C.   John Will Suffer Irreparable Harm Without Judicial Intervention ............................... 21

    D.   The Harm to John Outweighs Any Potential Harm to the University .......................... 23

    E.   The Public Interest Weighs in Favor of Granting the Injunction.................................. 24

IV.   Conclusion ................................................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Anderson v. U.S.F. Logistics (IMC), Inc.*,
    274 F.3d 470 (7th Cir. 2001) ...........................................................................................8, 21

*Bissessur v. Ind. Univ. Bd. of Trs.*,
    2008 U.S. Dist. LEXIS 69299 (S.D. Ind. Sept. 10, 2008) ................................................16, 17

*Chang v. Purdue Univ.*,
    985 N.E.2d 35 (Ind. Ct. App. 2013).................................................................................15, 16

*Collick v. William Paterson Univ.*,
    2016 U.S. Dist. LEXIS 160359 (D.N.J. Nov. 17, 2016)........................................................13

*Cumulus Radio Corp. v. Olson*,
    80 F. Supp. 3d 900, 904 (C.D. Ill. 2015) ...........................................................................8, 21

*Doe v. Brandeis*,
    177 F. Supp. 3d 561, 604 (D. Mass. 2016) ...............................................................20, 21, 22

*Doe v. Brown Univ.*,
    166 F. Supp.3d 177, 190-91 (D.R.I. 2016) ..................................................................9, 10, 15

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016)..........................................................................................9, 12, 13

*Doe v. Lynn Univ., Inc.*,
    2017 U.S. Dist. LEXIS 7529 (S.D. Fla. Jan. 19, 2017) .......................................................13

*Doe v. Middlebury Coll.*,
    2015 U.S. Dist. LEXIS 124540 (D. Vt. Sept. 16, 2015).............................................20, 22, 23

*Doe v. Rector & Visitors of George Mason Univ.*,
    149 F. Supp.3d 602, 613 (E.D. Va. 2016) ...........................................................................22

*Doe v. Rector & Visitors of George Mason Univ.*,
    179 F. Supp.3d 533, 588 (E.D. Va. 2016) ...........................................................................24

*Doe v. Univ. of Cincinnati*,
    2016 U.S. Dist. LEXIS 165163 (S.D. Ohio Nov. 30, 2016)..................................................21

*Fitzgerald v. Barnstable Sch. Comm.*,
    555 U.S. 246 (2009)...............................................................................................................9

*Harder v. Vill. of Forest Park*,
  2005 U.S. Dist. LEXIS 28068 (N.D. Ill. Nov. 14, 2005).........................................8

*Mallory v. Ohio Univ.*,
  76 Fed. Appx. 634 (6th Cir. 2003).........................................................9

*Marshall v. Ind. Univ.*,
  170 F. Supp.3d 1201, 1209-10 (S.D. Ind. 2016).................................13, 15

*Mayflower Transit v. Ann Arbor Warehouse Co.*,
  892 F. Supp. 1134 (S.D. Ind. 1995)...................................................8, 9

*Neal v. Colo. State Univ.-Pueblo*,
  2017 U.S. Dist. LEXIS 22196 (D. Colo. Feb. 16, 2017) ......................13

*Ritter v. Okla. City Univ.*,
  2016 U.S. Dist. LEXIS 95813 (W.D. Okla. July 22, 2016)............................ passim

*Somerset Place, LLC v. Sebelius*,
  684 F. Supp. 2d 1037 (N.D. Ill. 2010) ...........................................8, 9, 21

*Storck USA L.P. v. Farley Candy Co.*,
  14 F.3d 311 (7th Cir. Ill. 1994).......................................................8

*Tully v. Orr*,
  608 F. Supp. 1222 (E.D.N.Y. 1985) ...................................................22

*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994)..............................................................10

## STATUTES

20 U.S.C. §§ 1681-1688 ...................................................................1

20 U.S.C. § 1681(a) ........................................................................9

## OTHER AUTHORITIES

Fed. R. Civ. P. 65.........................................................................8

## I.     INTRODUCTION

Plaintiff, John Doe ("John") files this Brief in Support of his Motion for Temporary Restraining Order and Preliminary Injunction against Defendant University of Notre Dame ("the University") in order to immediately halt the University's enforcement of John's dismissal from school just two weeks before he completes his classes and two exams required to graduate in May 2017.  The University took this action following Title IX disciplinary proceedings brought by a vindictive ex-girlfriend (referred to herein as "Jane Roe" and "Jane") that lacked any semblance of objectivity or fairness.  The ex-girlfriend complained of *text messages* in which John expressed thoughts of suicide.  There were no allegations of physical violence or improper sexual coercion in her filings, yet still the University took the extreme step of dismissing John from school.  John need only pass two exams to attain his degree (which he is prepared to take now, on or off campus), yet he now faces the specter of a gap in his education that will have an immediate impact on his post-graduation employment.  Indeed, John will suffer irreparable harm as a result of the University's unlawful actions and has a reasonable likelihood of success on the merits of his claims.  John has filed a Verified Complaint against the University seeking injunctive relief and damages.  While he is entitled to relief on all counts, he moves for immediate relief only as to his claims for breach of contract and violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, which bars the imposition of university discipline where gender is a motivating factor.

John satisfies all the prerequisites for immediate injunctive relief.

First, John will likely succeed on the merits of his Title IX and breach of contract claims. Under the University's contractual promises and the law, John had the right to a fair and impartial disciplinary investigation, hearing, and hearing review.  The University violated these

1

rights.  For example, the University's Office of Community Standards failed to provide him proper notice of the allegations he would face at the Administrative Hearing, failed to ensure meaningful access to a resource coordinator, disregarded Jane's misleading and false statements at the hearing, ignored video of Jane stating that her intention was to "f**k up his reputation" and "destroy him," overlooked Jane's tampering with witnesses in an effort to manipulate the hearing, overlooked Jane providing deliberately false information to the Title IX Investigator and witnesses regarding the status of an unsigned, unfiled affidavit, and failed to sanction Jane for filing false reports against John.

Second, John has no adequate remedy at law.  Monetary damages cannot compensate for the loss of his college degree on time.  Similarly, monetary damages will not remedy the notation of dismissal on his academic transcript and the inclusion of sexual misconduct and harassment findings in his permanent record.

Third, John has suffered, and will continue to suffer, irreparable harm without the grant of a temporary restraining order.  He has already missed four days of classes with only two weeks, and two exams, remaining in his semester and college career.  He now faces the threat of an academic record that will include permanent and serious findings of misconduct, with offense titles suggesting far more serious conduct than the text messages that form the basis of the University's decision.  In addition, John will lose the opportunity to obtain his hard-earned degree on time, and will risk losing a lucrative employment position set to begin in June 2017. While he fully expects to win this case on the merits, he will never recover the value of attaining his degree on time and an academic transcript unblemished by a notation of dismissal.  If the University's decision to dismiss John is allowed to stand, he will also suffer a gap in his

schooling that he will need to explain for the remainder of his professional life, even if he is ultimately reinstated.

Fourth, the harm to John if the relief he requests is denied is far greater than any harm to the University that could result from granting that relief, particularly where John only seeks permission to take the two final exams required to attain his degree — and John has offered to do so off-campus.

Finally, the public has an undeniable interest in ensuring that the University's wrongful, inequitable, and discriminatory conduct is enjoined.  The public also has an interest in seeing that college or university students do not face dismissal only weeks before graduation, particularly where the school, like the University, has breached its contract with the student and violated federal law.[1]

## II.    FACTUAL BACKGROUND

John incorporates by reference the facts alleged in his Verified Complaint into this Brief, and will summarize only the essential facts here.

This is an action that arises out of a decision by the University to dismiss John from school just three weeks before graduation during a difficult moment in his life when he was experiencing episodic depression, including suicidal ideation, and was clearly in need of mental health resources and formative remedies.  The University did this to John in response to a vindictive Title IX proceeding instigated by John's ex-girlfriend on the basis that she believed John's repeated attempts to reach out to her for support primarily through text messages were harassing and constituted "dating violence."  (Compl. ¶ 1).  John is a senior who has fulfilled all

---

[1]        Contemporaneously with the filing of this Motion and Complaint, Plaintiff has filed a Motion for Permission to Proceed Under a Pseudonym, seeking permission of the Court to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein and to comply with the University's requirement that disciplinary proceedings be kept confidential.

requirements for graduation other than taking two final exams set to begin on May 8th—which he is willing to take off-campus.  (*Id*. ¶ 17).  John and Jane were engaged in an intimate but tumultuous relationship for more than a year, beginning in the fall of 2015.  (*Id.* ¶ 20).  Throughout the summer of 2016, John developed serious depression that became an ongoing struggle, including with ideations of suicide.  (*Id.* ¶ 22).  John maintained throughout the ensuing disciplinary proceedings that Jane directed threats of suicide to John—the very same conduct she accused of John.  (*Id.*)

The tumultuous relationship ultimately ended in a breakup, followed immediately by Jane filing a complaint with the University on November 28, 2016, based on John's behavior of repeatedly sharing his thoughts of suicide.  (*Id.* ¶¶ 25-26).  Within twenty-four hours, the University issued a "No-Contact Order" to John preventing him from having any contact with Jane, but making allowance for "incidental contact."  (*Id.* ¶ 27).  John immediately deleted Jane's contact information and text messages from his phone so that he would not be able to reach out to her; in so doing, John lost all of his saved text communications with Jane, which would turn out to be critical evidence in the ensuing University disciplinary proceedings.  (*Id.* ¶¶ 30-31).  Once Jane understood that she controlled the universe of text messages between herself and John, she selectively produced to the University excerpts of text message chains, which were carefully cherry-picked to depict John in the most negative light possible.  (*Id.* ¶ 31).

At the time of Jane Roe's complaint against John, the University's Policy on Sexual and Discriminatory Harassment (the "Policy") supplied the definitions of sexual and discriminatory harassment that were applied to the charges Jane brought.  (A true and correct copy of the University of Notre Dame Policy on Sexual and Discriminatory Harassment attached hereto as Exhibit "A.")  The University's student handbook, *du Lac: A Guide to Student Life* ("the

4

Guide"), also provides procedures that apply to investigations and hearings with respect to University disciplinary proceedings.  (A true and correct copy of the relevant portion of the Guide is attached hereto as Exhibit "B.")

After Jane submitted her complaint, John met with a representative from the University's Office of Community Standards ostensibly to provide an opportunity for John to learn about the hearing process and to ask questions.  (*Id.* ¶ 72).  John was told virtually nothing about the accusations Jane had made, despite repeatedly asking for the specific allegations against him so that he could begin to prepare a defense and suggest sources of information for investigators to pursue.  (*Id.*)  John was also assigned a "Resource Coordinator" who was required to "serve as resource persons to the complainant and respondent to identify, explain, and navigate the reporting options and the available support services ... [including] referrals to counseling, educational support, pastoral care, medical treatment and information about University and legal processes," but the coordinator was almost completely nonresponsive to John.  (*Id.* ¶ 73).  During the investigation, John submitted the names of multiple witnesses to the investigator, but made a point to emphasize that two specific witnesses were particularly relevant and should be spoken with immediately.  (*Id.* ¶ 75).  John later learned that the investigator never contacted these witnesses.  (*Id.*)  When it also became clear that Jane had submitted partial and incomplete excerpts of longer text message conversations between John and herself, John repeatedly asked the University to compel complete productions from Jane.  The University ignored these requests and permitted Jane to selectively produce only the messages she unilaterally deemed relevant to the proceedings.  (*Id.* ¶ 76).

Based on the investigator's deeply skewed and incomplete findings, the Deputy Title IX Coordinator concluded an Administrative Hearing was warranted, set a hearing date of February

24, 2017, and provided notice to John that for the first time outlined the specific offenses John would face at his hearing.  (*Id.* ¶ 78).  John submitted his final position statement to the hearing panel along with a letter from his University-employed psychologist describing John's therapeutic progress for consideration by the hearing panel.  (*Id.* ¶¶ 80-81).

Two days before the hearing, the University permitted Jane to produce roughly 1,000 additional pages of material, in addition to the 500 already produced, and to make numerous new allegations of abusive conduct, all under the guise of "supplementing" the record.  (*Id.* ¶ 84).  At the hearing, John submitted questions for the complainant and various witnesses; however, the Hearing Panel shut down any questions or statements by John and his witnesses that in any way referenced conduct by Jane, no matter how relevant to the hearing.  (*Id.* ¶ 88).  Jane also made new allegations at the hearing not previously disclosed in her written statements.  (*Id.* ¶ 90).  John was unable to refute these allegations due to the late notice and the failure of the University to obtain the full text conversations, despite his requests.  (*Id.*)

 Ultimately, on March 20, 2017, the Hearing Panel found that John violated the standards of conduct for "stalking," "willful damage to the reputation or psychological well-being of another," "dating violence," and "abusive or harassing behavior."  (*Id.* ¶¶ 91-92).  The Hearing Panel's decision sanctioned John as follows: "You are hereby dismissed from [the University] through the 2017 Fall Semester.  You are provided the opportunity to apply for readmission to the University; however, you will not be eligible for readmission ... until the 2018 Spring Semester.  Your *permanent* academic record shall read 'Dismissal with the Opportunity to Apply for Readmission.'"  (*Id.* ¶ 93) (emphasis added).

John appealed the Hearing Panel's decision on the basis of procedural errors which substantially affected the fairness of the process and newly discovered evidence, including *inter alia*:

- A phone video taken on February 11, 2017 by a mutual friend, which clearly shows Jane stating that: "I want to f**k up his [John's] reputation; I want to make sure he never has a girlfriend... here or anywhere...and I want him never to be able to have a social life..."  John did not obtain this evidence before the hearing because the student who filmed it did not disclose its existence until learning that John was dismissed from the University;

- Jane had used coercion, pressure and false information to induce two witnesses to refrain from coming forward and providing evidence in John's defense.  One of these witnesses was a close friend of Jane's, who sent a text message to John after his hearing stating that she had been "played" by Jane, and asked whether it was too late to help.  This witness explained that she felt morally compelled to come forward when she learned that John had been dismissed from school;

- John had learned through witness testimony at the hearing that Jane had used an unsigned and unverified draft affidavit to manipulate the Title IX investigator and potential witnesses, by providing individuals with the content of the affidavit and falsely representing it was filed in court as part of her petition for protective order, suggesting that it could be relied upon as an official court document.

(*Id.* ¶ 98).  John also attempted to obtain a letter from his University-employed therapist attesting to the fact that he was fit to attend classes, only to learn that the Director of the Office of Community Standards (OCS), who presided over John's disciplinary proceeding, had contacted John's therapist's supervisor to communicate that he was displeased that the University Counseling Center had submitted a letter advocating for John.  (*Id.* ¶ 99).  As a result, John's therapist declined to draft a letter on John's behalf.  (*Id.*)

Despite the procedural errors and new evidence, on April 13, 2017, the University Review Board rendered its decision in a three-sentence letter advising that John "did not establish sufficient grounds for a case review," and that the Hearing Panel's decision is final.

7

John is currently dismissed from the University with only two weeks of classes and two exams remaining in order to complete his degree.

## III.   ARGUMENT

Fed. R. Civ. P. 65 permits a court to grant a temporary restraining order when a plaintiff has demonstrated, through specific facts in an affidavit or a verified complaint, that they will suffer "immediate and irreparable injury, loss, or damage."  "In the Seventh Circuit, the standards for a TRO and a preliminary injunction are virtually identical."  *Harder v. Vill. of Forest Park*, 2005 U.S. Dist. LEXIS 28068, *4 (N.D. Ill. Nov. 14, 2005).  To determine whether a temporary restraining order is warranted, the party seeking the order must demonstrate that: 1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; and 3) it will suffer irreparable harm if the preliminary injunction is denied.  *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 474–75 (7th Cir. 2001); *Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 904 (C.D. Ill. 2015).  The second and third elements—no adequate remedy at law and irreparable harm—tend to merge.  *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1042 (N.D. Ill. 2010).  "If these three conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently."  *Mayflower Transit v. Ann Arbor Warehouse Co.*, 892 F. Supp. 1134, 1138 (S.D. Ind. 1995) (granting preliminary injunction on breach of contract argument).  The balancing involves a sliding scale analysis: "the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor."  *Storck USA L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. Ill. 1994).  Finally, the court considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties.  *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1040 (N.D. Ill. 2010); *see also Mayflower Transit*, 892 F. Supp. at 1144.

John's case satisfies all of the requirements for a TRO and preliminary injunction.  As courts across the country have recognized in cases involving issues similar to those here, this case cries out for immediate injunctive relief.  *See infra.*

**A.      John is Likely to Succeed on His Title IX and Breach of Contract Claims**

      **1.      John Is Likely to Succeed on His Title IX Claim Because the University Treated John, a Male Student, Differently to His Detriment, From Jane Roe, Based on His Gender**

Title IX guarantees that "[n]o person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX "'bar[s] the imposition of university discipline where gender is a motivating factor,'" and is enforceable through a private right of action for injunctive relief and damages.  *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714–15 (2d Cir. 1994).  Nonpublic institutional recipients of federal funds, such as Notre Dame, may be held liable under Title IX.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

John asserts three well-established theories of liability under Title IX.  A "deliberate indifference" theory requires the plaintiff to ultimately show that "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the [university's] misconduct."  *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 638 (6th Cir. 2003); *see also Doe v. Brown Univ.*, 166 F. Supp.3d 177, 190-91 (D.R.I. 2016).  A "selective enforcement" theory requires that the school's "decision to initiate the proceeding" or the "severity of the penalty" "was affected by the student's gender" without regard to guilt.  *Yusuf*, 35 F.3d at 715; *Brown*, 166 F. Supp.3d at 185, quoting *Yusuf*.  An "erroneous outcome"

9

theory requires that the college "wrongly found" that the student committed the offense.  *Yusuf*, 35 F.3d at 715.  *See Brown*, 166 F. Supp.3d, at 190–91 (quoting *Yusuf*).

In addition, the Office for Civil Rights ("OCR") of the Department of Education, the office that administratively enforces Title IX, has promulgated a number of regulations to evaluate whether a school's grievance procedures for sexual misconduct cases are prompt and equitable.  (*See, e.g.*, Office of Civil Rights, *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties* (2001) ("2001 Guidance")).  These regulations require schools to provide the following basic due process elements:

- "***Notice to students . . . of the [school's] procedure***";

- "***Adequate, reliable, and impartial investigation of complaints*, including the opportunity to present witnesses and other evidence**";

- "***Designated and reasonably prompt timeframes for the major stages of the complaint process***."

(*Id.*) (emphasis added).  OCR's 2001 Guidance further provides that "[*a*]*ccording due process to both parties involved*, will lead to sound and supportable decisions."  (*Id.* at 22) (emphasis added).   Title IX's "due process" requirement applies to both state and private colleges and universities.  (*Id.* at 2, 22).

On the facts as alleged in the Complaint, John will likely succeed on his Title IX claims. Gender discrimination and gender stereotypes permeated the University's investigation, hearing, and appeal.   For instance, throughout the investigation, it was apparent that Jane had submitted partial and incomplete excerpts of longer text message conversations between herself and John. John repeatedly pointed out to the investigator that he was unable to produce complete text chains and that the University should compel Jane to produce complete information for its review and investigation.  The University and the investigator chose to do nothing.  Likewise,

John submitted the names of multiple witnesses to the investigator, even making a point to emphasize that two specific witnesses were particularly relevant. Again, the University and the investigator chose to do nothing.

Contravening legal requirements of even handedness and fair treatment imposed by Title IX, and in violation of OCR's 2001 Guidance, the University consistently ignored John's requests for resources and information as well as his complaints of harassment from Jane. In contrast, all University offices and resources were patently responsive to all Jane's requests. For example, when Jane initially complained of John's behavior, he was served with a No-Contact Order by University police within 24 hours; and whenever Jane falsely alleged a violation of the No-Contact Order, University police sprang into action. To date, as discussed below, every complaint John has made against Jane regarding her harassing behavior has been ignored by the University. The Office of Community Standards applied an obvious double standard in reviewing and responding to the parties' complaints. When Jane complained of harassment by John, a No-Contact order was put in place within 24 hours, and her further complaints of violations of the No-Contact order were met with swift action by University police. On the other hand, when John complained of Jane's abuse of the No-Contact Order by making false accusations in order to traumatize and embarrass John—a student undergoing therapy and suffering from known depression and suicidal ideation—the University did nothing. John reported to the Title IX Office and filed official complaints through the University's "Speak Up" portal of the OCS website that Jane had directed harassing behavior toward him, including her multiple false allegations of No-Contact Order violations, her recorded statements expressing that her true motivation in pursuing Title IX charges against John was to "destroy" him, and her highly improper and successful efforts to intimidate and coerce witnesses from testifying on

John's behalf.  The University again failed to respond or even acknowledge the majority of John's complaints, and has yet to respond in any meaningful way to his reports of Jane's harassing behavior during the proceedings.  The University's drastically different treatment of Jane's and John's complaints clearly demonstrates that only her accusations of harassment were taken seriously, while John's complaints went unaddressed throughout the process.

John's claims closely mirror those which the Second Circuit in *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016), found stated a claim under Title IX.  In support of its ruling, the court cited factual allegations that the University had failed to seek out witnesses and information favorable to the respondent; failed to "act in accordance with University procedures designed to protect accused students"; and "reached conclusions that were incorrect and contrary to the weight of the evidence."  *Id*. at 56-57.  In the *Columbia* court's words, "[t]he alleged fact that [the University's agents] . . . chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute."  *Id*. at 57.  Public criticism of Columbia's handling of sexual assault claims, and Columbia's response to those accusations, makes it "entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."  *Id*.

Likewise, recent federal district cases have recognized plausible Title IX gender discrimination claims by male students accused of violations of sexual misconduct policies.  *See, e.g.*, *Neal v. Colo. State Univ.-Pueblo*, 2017 U.S. Dist. LEXIS 22196, at *20-47 (D. Colo. Feb. 16, 2017) (recommending denial of a motion to dismiss where male student alleged gender-

skewed implementation of a Title IX enforcement policy, procedural shortcomings in the

investigation, and biased statements against male athletes by the university investigator); *Doe v.*

*Lynn Univ., Inc.*, 2017 U.S. Dist. LEXIS 7529, at *5-14 (S.D. Fla. Jan. 19, 2017) (denying

motion to dismiss where university had received prior criticism for its handling of sexual

misconduct complaints by female students, university officials were aware of criticism, and the

university was aware of the national pressure to prosecute male students accused of sexual

assault); *Collick v. William Paterson Univ.*, 2016 U.S. Dist. LEXIS 160359, at *26-37 (D.N.J.

Nov. 17, 2016) (denying motion to dismiss where university accepted accusations by female

complainant as true without investigation, did not develop facts or exculpatory evidence for the

accused student, and failed to conduct a thorough and impartial investigation); *Ritter v. Okla.*

*City Univ.*, 2016 U.S. Dist. LEXIS 95813, at *3-6 (W.D. Okla. July 22, 2016) (denying motion

to dismiss where male student alleged university conducted investigation and disciplinary

process favorably towards female students and based the severity of sanctions on the gender of

the accused); *Marshall v. Ind. Univ.*, 170 F. Supp.3d 1201, 1209-10 (S.D. Ind. 2016) (denying

motion to dismiss Title IX claims where male student alleged selective, gender based

enforcement against him individually and a failure by the university to investigate similar claims

by the male student against the female student).

Like *Columbia*, as alleged in the Complaint, tremendous legal and financial pressure has

been exerted against the University to favor female complainants over accused male students by

the OCR, the media, and student activists.  In particular, the OCR's issuance of its Dear

Colleague Letter, its opening of three investigations into the University's handling of sexual

assault reports, and the threat of withdrawal of federal funding has given the University a

powerful incentive to adopt and implement policies deliberately designed to appease the OCR.

13

Furthermore, as alleged in the Complaint, the University's Policy on Sexual and Discriminatory Harassment as conceived and implemented by the University was deliberately designed to favor the female accuser and disadvantage the accused male by, among other things, eliminating from the process fundamental procedural safeguards for the accused set forth in Title IX. The Policy was systemically inequitable in practice toward students accused of misconduct (who are overwhelmingly male). Among the many procedures that unfairly disadvantaged accused male students, the Policy eliminated a full hearing process, in which both parties had an equal opportunity to question and confront each other and witnesses and to present evidence in front of an impartial and independent Hearing Panel.  Additionally, accused students are not entitled to notice of the allegations until just days before the hearing.  Although an accuser knows the charges and the substance of her allegations from the beginning of the case, and the documents she will use, the accused is left in the dark to blindly prepare his defense.  (*See* Compl. ¶¶ 78-84).

Although the cases cited in this section were decided on motions to dismiss, the courts' conclusions nonetheless support John's position here: he has alleged similar facts, and his factual allegations demonstrate that he has adequately alleged gender bias and is likely to prevail on the merits of his Title IX claim. At this stage of the proceedings, without the benefit of discovery, John is not able to offer specific case examples or statistics to support his allegation that the University deliberately favors women over men.  Significantly, as a district court recently stated:

> One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant: namely, what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male? . . . . Requiring that a male student conclusively demonstrate, at the pleading stage,

14

> with statistical evidence and/or data analysis that female students
> accused of sexual assault were treated differently, is both
> practically impossible and inconsistent with the standard used in
> other discrimination contexts.

*Brown*, 166 F. Supp.3d at 187, 189; *see also Marshall*, 170 F. Supp.3d at 1210 (noting that

although the male student's pleading lacked "the contours of more particularized facts, the

Defendants do not deny that they are in sole possession of all information relating to the

allegations"). The *Brown* court's observations apply equally here. Even without the benefit of

such statistics, however, the University's treatment of John throughout all segments of the

disciplinary process evinced blatant violations of Title IX. The University has control over the

relevant data regarding gender bias, and the facts John has alleged show a likelihood of success

on the merits of his Title IX claim.

### 2.      John Is Likely to Succeed on His Breach of Contract Claim

Courts applying Indiana law have analyzed the relationship between a student and a

university under many different legal doctrines, though "[t]he most pervasive and enduring

theory is that the relationship between a student and an educational institution is contractual in

nature." *Chang v. Purdue Univ.*, 985 N.E.2d 35, 46 (Ind. Ct. App. 2013), quoting *Neel v. Ind.*

*Univ. Bd. Of Trs.*, 435 N.E.2d 607, 610 (Ind. Ct. App. 1982). It is generally accepted that

"a university's catalogues, bulletins, circulars, and regulations that are made available to its

students become a part of this contract," and, thus, establish the basic terms of the relationship

between student and university. *Chang*, 985 N.E.2d 35, 46 (Ind. Ct. App. 2013). To state a

claim for breach of contract in the student-college context, a plaintiff "must point to an

identifiable contractual promise that the defendant failed to honor," for example, "if the

defendant took tuition money and then provided no education, or alternately, promised a set

number of hours of instruction and then failed to deliver." *Bissessur v. Ind. Univ. Bd. of Trs.*, 2008 U.S. Dist. LEXIS 69299, at *28 (S.D. Ind. Sept. 10, 2008).

Bad faith or capricious treatment of a student by a university demonstrates a breach of the contract with the student.  In the university-student context, the so-called "good faith judgment model" balances and maximizes the important considerations of "academic freedom and provides an acceptable approximation of the educational expectations of the parties." *Chang*, 985 N.E.2d at 47.  The relevant questions, then, for the purposes of the temporary restraining order, are whether John is likely to succeed in demonstrating at trial that the University's decision to dismiss him from school was "reached in an illegal, arbitrary, or capricious manner," or whether the University "acted in bad faith" in its treatment of John.  Both questions are answered in the affirmative.  *See King*, 2014 U.S. Dist. LEXIS 11705 at *31.

The analysis of the Southern District of Indiana case of *King v. DePauw University*, which enjoined a university's attempt to sanction a student based on a flawed disciplinary process, is directly analogous to this case.  In *King*, DePauw investigated and ultimately expelled the student, King, from the university for one year.  *Id.* at *25.  King filed a preliminary injunction, seeking to permit him to resume his studies, which the court granted.  *Id.* at *43. District Judge William T. Lawrence found that King demonstrated a likelihood of success on the merits of his breach of contract claim because DePauw's disciplinary process and conclusion "was reached in an illegal, arbitrary, or capricious manner" and DePauw had "acted in bad faith in its treatment of King."  *Id.* at *31.  The court noted that certain facts "bolstered" King's likelihood of success.  *Id.* at *36.  For instance, the investigator chose to select and interview favorable witnesses for the complainant, but failed to "ferret out other students who might have additional information."  *Id.* at *37.  "So, too, might the jury find troubling the incomplete nature

16

of the questions the Board asked at the hearing." *Id.* The court's reasoning directly applies to the facts of the instant matter.

Despite the University's promise to students to provide "prompt, **fair, and impartial investigation and resolution**" of complaints, its actions throughout the disciplinary process breached identifiable contractual promises to John. Exh. B, at 5 (emphasis added). During the investigation phase, although John was promised access to a Resource Coordinator to "serve as resource persons to the complainant and respondent to identify, explain, and navigate the reporting options and the available support services," the University administrator assigned to this task was unresponsive. Exh. B, at 14. John's repeated emails with questions about his rights and the University's processes went unanswered, and John was left to navigate this process in the dark, during a difficult moment in his life where he had become depressed and episodically suicidal. (Compl. ¶ 73).

The University also failed to take action in regards to John's complaints of violations of the policy against harassment. John reported to the Title IX office and filed official complaints through the University's "Speak Up" portal of the OCS website that Jane had directed harassing behavior toward him. Despite the promises in the Guide that the Deputy Title IX Coordinator will respond to such reports, the University failed to acknowledge the majority of John's complaints, and has yet to respond in any meaningful way to his reports of Jane's harassing behavior during the proceedings. Exh. B, at 16. The failure of the University to fulfill the identifiable promises constitutes a textbook breach of contract in the context of a university-student relationship. (Compl. ¶¶ 53, 73, 130).

Like the hearing board in *King*, the conduct of the board at the Administrative Hearing proved inadequate and preferential in favor of Jane Roe. At the outset, John submitted questions

17

to be asked of the complainant and various witnesses in advance of the hearing.  Many of these questions were disregarded by the panel.  (Compl. ¶¶ 88-89).  In addition, the Hearing Panel exhibited open and obvious preferential treatment of Jane during the Hearing, evident in that it permitted Jane to testify at length regarding John's behavior toward her throughout the course of their relationship, and at the same time precluding John from testifying at all about Jane's behavior toward him—often admonishing John that only his conduct was on trial.  (*Id.* ¶ 88).  The Panel actively and aggressively shutdown any questions or statements by John and his witnesses that in any way referenced conduct by Jane, whether it was past instances of her abusive behavior toward John, past threats of suicide made by Jane, or statements attempting to provide context for the message exchanges put at issue by Jane.

The bad faith and capricious nature of the University's actions continued during the appeal process.  The Director of the Office of Community Standards ("OCS"), the same person who presided over John's disciplinary proceeding, contacted the John's psychologist's supervisor to communicate that his displeasure that the UCC had submitted a letter on John's behalf at the Hearing.  The Director of OCS went so far as to instruct his therapist that she should never advocate for an accused student again, unless specifically instructed by the University.  Based on this admonishment from the University, John's therapist—who was a University employee—was not able to draft a letter on John's behalf.   John also obtained and submitted to the Review Board a cell phone video that, as noted above, clearly depicts Jane describing her vindictive motives in pursuing her complaint.  The Review Board ignored the video.  Significantly, the person who recorded the video admitted in an affidavit that he did not come forward before the hearing because Jane's friends pressured him not to.

18

It is of note that John explained in his appeal to the Review Board that he had learned through witness testimony at the hearing that Jane had used an unsigned and unverified draft affidavit to manipulate the Title IX investigator and potential witnesses, by providing individuals with the content of the affidavit and falsely representing it was filed in court as part of her petition for protective order, suggesting that it could be relied upon as an official court document.  Faced with this information, which violated the University's policy against providing "deliberately false information," the Review Panel chose to do nothing, including enforcing its own policy to engage in "appropriate disciplinary action" for Jane Roe's lies.  Exh. B, at 20.  The University's blatant attempts to tip the scales in favor of upholding John's dismissal eviscerated the basic fairness he was due by law and under the terms of the Policy and the Guide.

For the reasons cited in the cases above, John is likely to succeed on his breach of contract claim due to the bad faith actions and capricious nature of the University's conduct.  As in *King*, the University failed to provide a fair and impartial investigation in ignoring two witnesses identified by John.  Furthermore, the University wholly failed to ensure that University community members, like Jane Roe, "provide truthful information" during an investigation.  *Id.* It also failed to enforce the promise of disciplinary action against a student who, like Jane Roe, has "provided deliberately false information and/or made an accusation in bad faith."  *Id.* Certainly Jane Roe's successful attempts to tamper with and threaten witnesses, along with her stated objective to "f**k up" John's reputation, amount to the type of bad faith prohibited in the Guide.

The University's multitude of breaches has and will continue to cause damages to John. This Court has the authority to grant equitable relief for the University's breach of contract.  *See King*, 2014 U.S. Dist. LEXIS 11705, at *43.  On facts similar to those here, courts have readily

found a likelihood of success on breach of contract claims and have granted injunctive relief. *See*, *e.g.*, *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *78 (finding likely success on the merits of breach of contract claim where college promised "an equitable resolution" and did not provide it; process in which accused did not have "a reasonable opportunity to present his version of the events" was unfair, particularly in light of severe penalty of expulsion); *Doe v. Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, at *15 (D. Vt. Sept. 16, 2015) (granting preliminary injunction to student expelled for purported sexual misconduct); *King*, 2014 U.S. Dist. LEXIS 117075, at *37-38  (finding likely success on contract claims where, among other things, it was not clear complainant was "incapacitated" under university's definition, investigator failed to seek out witnesses favorable to accused student, and hearing panel engaged in an incomplete line of questioning ); *see also Doe v. Brandeis*, 177 F. Supp. 3d 561, 604 (D. Mass. 2016) (in case involving student disciplined for alleged sexual misconduct, court denied university's motion to dismiss certain breach of contract claims and held plaintiff plausibly alleged university failed to provide basic fairness by failing to give him adequate notice, denying him the right to confront his accuser or cross-examine witnesses, and denying him copies of documents).

In the words of the *Brandeis* court: "[T]his was not a criminal proceeding, and [the University] is not a governmental entity. Nonetheless, the stakes were very high. John was charged with serious offenses that carry the potential for substantial public condemnation and disgrace. He was required to defend himself in what was essentially an inquisitorial proceeding that plausibly failed to provide him with a fair and reasonable opportunity to be informed of the charges and to present an adequate defense. He was ultimately found 'responsible,' and received a penalty that may permanently scar his life and career.  Under the circumstances, the complaint plausibly alleges that the procedures employed by [the University] did not provide him with the

'basic fairness' to which he was entitled." *Id.* at 607.  The court's observations and conclusions apply equally, if not moreso, here, where the serious failings on the part of the University unequivocally breached its contact with John.

**B.      There is No Other Adequate Remedy at Law for John**

To demonstrate an inadequacy of relief at law, a party must show that money damages do not provide a sufficient remedy.  *See Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 912 (C.D. Ill. 2015).  Here, it is readily apparent that money damages would not and cannot remedy John's loss of his degree or the gap in his education.  Furthermore, as the analysis of the adequacy of a remedy at law element and the irreparable harm element tend to merge, this element is met for the reasons more fully stated in the following section.  *See Somerset Place, LLC*, 684 F. Supp. 2d at 1042 (N.D. Ill. 2010) (analyzing the no adequate remedy at law element and the irreparable harm element in the same section as they "tend to merge").

**C.      John Will Suffer Irreparable Harm Without Judicial Intervention**

To demonstrate irreparable injury, plaintiff must show that he will suffer immediate harm that cannot be rectified by final judgment after trial.  *Anderson*, 274 F.3d at 478.   That element is satisfied here.  First, the dismissal of John from the University only weeks before his graduation, and after he has invested tens of thousands of dollars in his education, constitutes irreparable harm.  In the context of a college disciplinary matter, a student's inability to continue or complete his education is *per se* irreparable injury.  *Doe v. Univ. of Cincinnati*, 2016 U.S. Dist. LEXIS 165163, at *17-18 (S.D. Ohio Nov. 30, 2016) (granting preliminary injunction and finding irreparable harm where the student testified at the injunction hearing that his suspension "would damage his academic and professional reputation");  *Ritter*, 2016 U.S. Dist. LEXIS

60193, at *8 ("loss of educational and career opportunities" is irreparable harm); *Tully v. Orr*, 608 F. Supp. 1222, 1225 (E.D.N.Y. 1985) (expulsion is irreparable harm).

Second, courts have held that "a student who is found responsible for sexual misconduct will likely face substantial social and personal repercussions. . . . a harsh consequence for an individual …who was not afforded … procedural protections." *Brandeis*, 177 F. Supp. 3d at 602; *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp.3d 602, 613 (E.D. Va. 2016) (expulsion for alleged sexual misconduct "plainly calls into question a plaintiff's good name, reputation, honor, or integrity," and "constitutes an alteration of his legal status as a student") (citation omitted).

Third, as a result of the University's contractual breaches, John will be irreparably harmed by the fact that his permanent academic record shall read 'Dismissal with the Opportunity to Apply for Readmission' based on findings of violations of the sexual misconduct policy. Even if justice prevails and John is found not responsible, or even if he could continue at another college, courts have held that *any* gap in a college education constitutes irreparable harm. As the court explained in *King v. DePauw University*:

> If [plaintiff] is not permitted to complete this upcoming semester at DePauw … he will forever have a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain another situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct at DePauw. ***Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding***.

2014 U.S. Dist. LEXIS 117075, at *39–40 (emphasis added); *see also Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, at *9 (finding irreparable harm because "[p]laintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap").

22

**D.      The Harm to John Outweighs Any Potential Harm to the University**

The harm John will suffer if he is unable to graduate, with only two weeks of classes and two exams remaining in his college career, outweighs any potential harm to the University from allowing John to complete his semester, sit for his exams, and graduate.  To the extent the University has concerns — however unreasonable — with regard to allowing John on campus, he could easily take his exams off-campus or in some other supervised setting that would allay the University's concerns.  Courts consistently find the balance of harms firmly favors students like John.  *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *5 (any harm to college is "inconsiderable" compared to harm to student if wrongfully expelled); *Middlebury Coll.*, 2015 U.S. Dist. LEXIS 124540, at *12–14 (balance weighs in favor of student); *King*, 2014 U.S. Dist. LEXIS 117075, at *40–42 (balance of equities "firmly" in student's favor; "the real, unavoidable consequences" he would suffer absent an injunction, even if he ultimately won the case, outweighed any harm to university).

By contrast, there is minimal, if any, harm to the University that would result from this Court granting the temporary restraining order and allowing John to graduate on time.  The University will not suffer harm by ensuring its disciplinary process adheres to the promises set forth to students in *du Lac: A Guide to Student Life*.  To date, under the facts of this case, the University has not honored its promises to John.  Similarly, the University will not suffer harm from a reminder that it must enforce its policies evenhandedly and in a manner that does not violate Title IX.  Thus, the colossal harm that John will suffer militates strongly in favor of granting the temporary restraining order to allow him to graduate.

### E.   The Public Interest Weighs in Favor of Granting the Injunction

This element weighs in John's favor.  The public, and specifically, the University community, has an interest in seeing the policies "applied fairly to both complainants and respondents in disciplinary actions."  *King*, 2014 U.S. Dist. LEXIS 117075 at *43 (finding that there is a public interest in a university or college applying its policies fairly to all parties involved in disciplinary proceeding).  "It is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8; *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp.3d 533, 588 (E.D. Va. 2016) ("[L]eaving in place a wrongfully imposed sanction and the record of such is plainly contrary to the public interest.").

 Here, it is abundantly clear that the public interest is best served by the University enforcing all aspects of its policies evenhandedly, particularly where there are substantial issues with the veracity of a complainant's testimony and statements during the investigation, witness tampering by one of the parties, and video evidence of a complainant's agenda provided to the appellate body at the University.  Granting the temporary restraining order will achieve this goal, while also allowing John to complete his college career.

## IV.   CONCLUSION

John respectfully requests that this Honorable Court grant a temporary restraining order that halts the order of dismissal issued by the University, requires the University to immediately allow John to resume his classes, and permits John to complete his final exams.  Further, John requests that this Honorable Court order the University to show cause why a preliminary injunction should not issue.

Respectfully submitted,

/s/ Peter J. Agostino

24

Peter J. Agostino                              (#10765-71)
Stephanie L. Nemeth                      (#25721-71)
ANDERSON AGOSTINO & KELLER, P.C.
131 South Taylor Street
South Bend, IN 46601
Telephone:  (574) 288-1510
Facsimile: (574) 288-1650
Email: nemeth@aaklaw.com
Email: agostino@aaklaw.com

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing pleading, to be

served upon counsel for Defendant Notre Dame University listed below by email and U.S. First

Class Mail on April 20, 2017:

Matthew Lahey, Esq.                         Damon R. Leichy, Esq.
Associate General Counsel               Barnes & Thornburg
University of Notre Dame                  700 1st Source Bank Center
203L Main Building                           100 North Michigan
Notre Dame, IN 46556                     South Bend, IN 46601
mlahey@nd.edu                                Damon.leichty@btlaw.com
*Counsel for Defendant*                     *Counsel for Defendant*


/s/ Peter J. Agostino
Peter J. Agostino

25