## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **3:17CV298-PPS/MGG** |
| | ) | |
| **UNIVERSITY OF NOTRE DAME,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>AMENDED OPINION AND ORDER</u>

A senior at the University of Notre Dame who brings this action as "John Doe" was dismissed from the university this spring, mere weeks before graduation, after being found guilty of violations of four Notre Dame Standards of Conduct. John now challenges his dismissal from Notre Dame on a number of legal theories, but only two of those theories are presently before me on his motion for a temporary restraining order and a preliminary injunction—a breach of contract claim and a claim under Title IX. The relief he seeks at the moment is narrow. He is *not* seeking the conferral of his degree at this time; he is *not* seeking to participate in the upcoming commencement ceremonies; and he is *not* seeking to set aside the other components of the discipline meted out by Notre Dame. Instead, John only seeks an order instructing Notre Dame to allow him to take the two final examinations that he needs to complete his coursework for the semester. Exam week begins today and runs through May 12, so time is of the essence.

<u>**Preliminary Injunction Standards**</u>

John's motion is for both a temporary restraining order and preliminary injunction. Parties (and judges) often have difficulty distinguishing between the two similar remedies. "'The essence of a temporary restraining order is its brevity, its ex parte character and ... its informality.'" *Wheeler v. Talbot*, 770 F.3d 550, 556 (7th Cir. 2014) (Ripple, J., dissenting), quoting *Geneva Assur. Syndicate, Inc. v. Med. Emergency Servs. Assocs. S.C.*, 964 F.2d 599, 600 (7th Cir. 1992). Notre Dame has been served with the complaint and the motion and has responded in writing. Notre Dame has also appeared twice in my court on the motion, including for a full-blown evidentiary hearing. In these circumstances, I consider the matter to be a request for a preliminary injunction rather than a temporary restraining order.

To obtain a preliminary injunction, John Doe must demonstrate that (1) he will suffer irreparable harm in the period before the case is decided on the merits; (2) traditional legal remedies are inadequate; and (3) his claim has some likelihood of success on the merits. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016). "If the plaintiffs make this showing, we then will weigh the factors against one another, assessing whether the balance of harms favors them or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Id*. The Seventh Circuit has "said repeatedly that the plaintiff's chances of prevailing need only be better than negligible." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). And there is an inverse sliding scale as between a plaintiff's likelihood of success and

his irreparable harm: "even though a plaintiff has less than a 50 percent chance of prevailing on the merits, he may nonetheless be entitled to the injunction if he can demonstrate that the balance of harms would weigh heavily against him if the relief were not granted." *Id.*, quoting *Curtis v. Thompson*, 840 F.3d 1291, 1296 (7th Cir. 1988).

Notre Dame has invoked the notion of an "affirmative" injunction, which some courts call a "mandatory" injunction. This term signifies an injunction that compels an action rather than merely maintains the *status quo*. *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Given that the *status quo* is that John is currently dismissed from the university, an injunction compelling Notre Dame to permit him to sit for his two final exams is technically an affirmative injunction, although just barely so. It won't cost Notre Dame a red cent to allow John to sit for the two exams. So while I take seriously the Seventh Circuit's admonition that a "preliminary injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is 'cautiously viewed and sparingly issued,'" *Knox v. Shearing*, 637 Fed.Appx. 226, 228 (7th Cir. 2016), quoting *Graham*, 130 F.3d at 295, the "affirmative" nature of what is being asked of Notre Dame is just not that burdensome. In all events, in the Seventh Circuit, the standards for obtaining such an affirmative injunction are the same as in any other case, but the balance of hardships factor simply "takes on heightened importance." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). This is in recognition that "[a] mandatory injunction imposes significant burdens on the

defendant and requires careful consideration of the intrusiveness of the ordered act[.]"
*Id*.

Notre Dame cites cases from the Ninth and Tenth Circuits that apply different and more stringent standards for the grant of an affirmative injunction, such as that a court should deny such relief "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotations marks and citations omitted). But of course I will apply the standards enunciated by the Seventh Circuit, which does not appear to embrace this particular heightened standard for mandatory injunctions.

## Factual Background

The facts set forth below relevant to the preliminary injunction analysis are either undisputed or have been established by a preponderance of the evidence in the preliminary injunction proceedings. John Doe and Jane Roe, both seniors this year at Notre Dame, began a dating relationship in the fall of 2015. During the summer of 2016, John developed serious depression while doing an externship in New York City and that led to thoughts of suicide. As John's depression worsened, his relationship with Jane became more tumultuous, as the couple "broke up" and reconciled more than once. By the Fall of 2016, John began making frequent statements about wanting to commit suicide and he repeatedly communicated this desire to Jane via text message. It is these text messages that would come back to haunt John five months later in his disciplinary hearing. But the relationship between John and Jane seems to have

4

continued throughout the tumult. Indeed, the record is replete with a steady stream of text messages going back and forth between John and Jane even after she first reported him to the University. Some involve talk of mental health issues and, indeed, suicide, but many do not.

On October 14, 2016, Jane met with Heather Ryan, Notre Dame's Deputy Title IX Coordinator in the Division of Student Affairs. Jane reported that she was concerned about John's safety because of the messages he had been sending her about wanting to kill himself. She was bothered by the volume of texts she was receiving and felt that they were manipulative, but at that point Jane was principally concerned about John receiving help. By going to the Title IX Coordinator, whether she knew it or not, Jane was invoking Notre Dame's policies and process relating to complaints of sexual harassment. In response, the University referred Jane to a number of resources, and assigned Jane a Resource Coordinator, Annie Eaton, as a contact for support relating to her issues with John. Eaton works generally as a "Care Consultant" at the University, a person who works with students experiencing difficulty or needing assistance with resources.

Jane's October 14 report to Ryan also prompted Associate Vice President Dr. Bill Stackman to meet with John and identify ways John could receive assistance if he was considering harming himself. The record doesn't reflect what mental health resources John was offered or apprised of, but Ryan's focus—and that of the Administrative Investigation in Notre Dame's process—is on behavior, not assessment of psychological

or emotional causes for behavior. In his email requesting a meeting with John, Dr. Stackman requested that John break off all forms of communication with Jane. This is a standard step for the administration to take when a student registers a complaint about interaction with another student.

Notre Dame's student handbook, known as *du Lac*, contains Community Standards and Standards of Conduct and is colloquially known as the "Red Book." The Red Book is issued annually, and in it, Notre Dame compiles the University's policies and procedures regarding sexual harassment, a category which includes sexual assault, sexual misconduct, dating violence, domestic violence, stalking and conduct that creates a hostile environment. Ryan concluded that John's behavior, as reported by Jane, could be a violation of these policies.

Jane made it clear to Ryan that she did not want a formal Administrative Investigation, but Jane did not have the final say on the matter. Ryan referred the matter to the University Tripartite Board, which makes a determination whether an investigation will be pursued even if it is against the complainant's wishes. After considering factors including John's lack of any disciplinary history, the absence of threats of violence to the complainant, and that the parties were not minors, the Tripartite Board agreed to Jane's request that an Administrative Investigation not proceed at that time. Jane was notified of that decision, and advised that she had six months, to April 27, 2017, to notify Ryan if she wished to initiate an Administrative Investigation of the matters she had reported.

As noted above, the persistent contact between John and Jane continued after the initial complaint by Jane. What we now know, although it wasn't revealed in Notre Dame's Administrative process, was that Jane and John continued a nearly daily discussion with one another. On October 31st they planned to meet up after work. [DE 39 at 4.] She told him to "Come overrrrr." [*Id.*] He proposed that they "take a nap" and she responded that "I'M SO PUMPED." [*Id.* (emphasis in original).] The following week, on November 7th, Jane asked John if he could sleep over. [DE 39 at 5.] Jane then implored John to "Come to champaign" (sic), which seems to have been a reference to him meeting her in Champaign, Illinois. [*Id.*] She also offered to meet him in Chicago. [*Id.*] Jane then asked John to come over that day because "she was having a really bad week already and I just wanna cuddle." [DE 39 at 7-8.] The following day they planned to get together again. Jane asked John "where you at (sic)" and he responded that he would "be there in 15 minutes." [DE 39 at 9.] Jane's response demonstrated that she was happy to be seeing him. She said "yayyy." [*Id.*] The next day they planned to meet up again at Chipotle around the noon hour. [*Id.*] And then later that night they must have planned another get-together because Jane told John that she was coming "to pick him up." [*Id.* at 9-10.] A week later, on November 15, Jane told John to "sleep overrrrrrrrrrr." [*Id.* at 10.] She later had a change of mind and cancelled because she needed to study and he responded that that was no problem. [*Id.* at 10.] John told her that he loved her and Jane responded that "I LOVE YOU TOO." [*Id.* at 11 (emphasis in the original).]

This cozy back and forth was never revealed during Notre Dame's investigation of John. It only came to light once this litigation was filed. But in any event, less than two weeks after Jane and John were planning sleepovers and expressing their love for one another, Jane evidently had a change of heart and decided to go forward with the complaint she previously lodged against John. The complaint was re-instituted on November 28, and the University issued a No Contact Order by letter to both parties dated the following day, November 29. Pursuant to that Order, both John and Jane were directed not to have contact with one another. The University considers the November 29 letter to have served as the "notice of charges" to John, but rather than any specific allegations, it merely advises John that "the incident alleged may be a violation of the University's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment." [Def. Exh. 118 at 1.]

An important thing happened after the No Contact Order was issued. John deleted Jane from his phone and, in the process, also permanently deleted the hundreds of text messages that they had sent to one another. Jane took a different tack. She decided to retain all of the text messages, and candidly this gave her the upper hand because it enabled her to control what texts would be produced and considered in the administrative process.

After Jane re-instituted the complaint, Heather Ryan met separately with both John and Jane, who were offered the opportunity to submit documentation to be

considered in the process.  An investigator, Lynn Kalamaros, was assigned to the case. As just described, John had no text messages to share with the Investigator Kalamaros because he had deleted them from his phone. Jane, on the other hand, provided Kalamaros with some, but not all, of the text exchanges between the two. The ones she shared with Kalamaros placed John in a very bad light and without context. Kalamaros, for example, had no idea that Jane had invited John to Champaign two weeks earlier, that they were having sleepovers and meeting up for "naps," or that Jane expressed her love for John in no uncertain terms.

The first thing Kalamaros did was schedule a meeting with John as the respondent in the matter.  Both parties were advised of the opportunity to identify witnesses who might be interviewed in the Administrative Investigation.  John and Jane were told that under the University's policies, they could have a "non-speaking" advisor in attendance with them at any hearing and other meetings, but third-party representation is not allowed to actively participate in the process.

Notre Dame's process is for the investigator, in this case Investigator Kalamaros, to do an investigation of the charges and then submit an Investigative Summary Report to Ryan.  Ryan then reviews the report to determine whether it appears that any Notre Dame policy may have been violated.  If she thinks so, Ryan again consults the complainant about whether to move forward with the process.  The next step is referral of the matter to Notre Dame's Office of Community Standards, which conducts a hearing on the charges of misconduct.

Shortly after the re-institution of the complaint by Jane, things started to really get nasty. On November 30, Jane reported to Ryan that John had supposedly followed her to a class, and Ryan viewed this as a potential violation of the No Contact Order. Similarly, on February 3, 2017, John sent Ryan an email in which he alleged that Jane herself had violated the No Contact Order by following him and taking pictures of him with her cell phone after an initial contact in a stairwell that was entirely inadvertent on his part. There was yet another incident wherein John was hauled out of class by University police officers based on an allegation by Jane that he had violated the No Contact Order in an academic building. But credible testimony at the preliminary injunction hearing from another student established that the interaction between John and Jane that day was merely a happenstance encounter making the claimed violation of the No Contact Order utterly spurious.

For some of these complaints, specifically the complaint from February 3rd, John and Jane reversed roles. John was the complainant and Jane the respondent. Yet it appears that Ryan never responded to John with the same references to resources as she had provided to Jane as a complainant.

The pattern of charge and counter-charge continued into mid-February. Jane made an allegation of retaliation by John involving sharing her confidential medical information with other people, and an administrative investigation was opened. Shortly thereafter, John also lodged another complaint about Jane. In mid-April, John used an online process to submit reports that Jane had violated the No Contact Order

and had intimidated witnesses in the disciplinary process. Heather Ryan confirmed receipt of those complaints and initiated an investigation by meeting with the individuals who might have been intimidated.

Notre Dame sometimes consolidates the handling of countercomplaints between parties. That seems like the sensible thing to do when back-and-forth complaints are made by people in a long-term relationship. In such a situation, there is the possibility that the parties are abusing the process. In any event, in this instance, Notre Dame did not consolidate the dueling complaints between John and Jane, and the allegations against her were largely omitted from the Investigative Summary Report and the Administrative Hearing of John.

In the meantime, action was occurring on another front. On November 30th, Jane obtained an order of protection from the state court in St. Joseph County, and provided a copy to Ryan that day. Jane initially asserted that the Circuit Court order required John to stay off campus entirely. But later an amended Ex Parte Order for Protection issued January 30, 2017 expressly provides that "Respondent is to be allowed to continue attending Notre Dame University until further action from the Court." [Pltf. Exh. 26, p.2.] At some point in time in the state court litigation, John requested discovery. He was seeking the entirety of his text exchanges with Jane. Jane balked, and instead of producing the text stream, she decided to dismiss her request for the restraining order and in the process frustrated John's efforts to get the full exchange

between the two so that he could tell the story of their tumultuous relationship in full context.

There is yet another thread that was dangling while the University's investigation was moving forward, and this one involved Jane's mother, who is an attorney. She sent a number of irate emails to Ryan, highly critical of Notre Dame's handling of Jane's complaints, and accusing the University of failing to protect Jane. In one of these, Jane's mother alleges that John's conduct threatening suicide was a particularly cruel exploitation of Jane's emotional vulnerability, knowing that she was coping with the recent deaths of three high school classmates. The emails that Jane's mother peppered the University with crescendoed to a January 25, 2017 message in which she referred to "the mounting evidence of Title IX violations and blatant disregard of court orders by [the Notre Dame Security Police]!" [Pltf. Exh. 30.] The same email invoked the name of Lizzie Seeberg, a young woman who committed suicide after she was allegedly sexually assaulted by a Notre Dame football player, an incident for which Notre Dame was widely condemned for the manner in which it handled the complaint.

Although Jane's complaint focused on the habitual and unwelcome frequency of John's communication to her after she had told him to stop, Ryan acknowledged that the investigation disclosed that at times Jane encouraged John to reach out to her if he felt suicidal. Kalamaros's investigative report, dated February 5, 2017, does reflect the tumultuous back-and-forth nature of John and Jane's relationship, but it doesn't tell the

whole story because, to repeat, Kalamaros only had selected text messages—indeed, selected by Jane—of the back-and-forth between the two.

Ultimately, Ryan reviewed the Administrative Investigation Report prepared by Kalamaros and concluded that there were possible policy violations of dating violence, stalking and harassment. With Jane's agreement, the matter was referred to what Notre Dame calls the "conduct process," that is, toward an Administrative Hearing conducted by the Office of Community Standards (OSC). At Jane's request, the disciplinary process was "paused" to allow her to obtain and provide additional information to be considered with the Investigative Summary Report.

John received a letter dated February 13 advising him that a hearing was scheduled for February 24. This letter is known as the "administrative hearing notification letter." The letter provided a list of four potential violations alleged against John that the hearing panel would consider: 1) Stalking; 2) Willful damage to the reputation or psychological well-being of another; 3) Dating violence, and 4) Abusive or harassing behavior, including unwelcome communication. [Pltf. Exh. 105 at 1.] Dating violence is defined in the Red Book as physical violence or the threat of physical violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with an individual. [Def. Exh. 107 at 6.] Stalking is defined as knowingly or intentionally engaging in a course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel

terrorized, frightened, intimidated, or threatened and that actually causes the individual to feel terrorized, frightened, intimidated, or threatened.  [*Id.* at 7.]

The notification letter explained that John could come to the OCS office during business hours to review, but not photocopy or otherwise duplicate, the Administrative Investigation documents (over 350 pages) prior to the hearing.  OCS identified in the letter witnesses it would invite to participate.  Pursuant to Notre Dame's policies, John could submit questions in writing for the Hearing Panel to consider asking witnesses.  Under the Red Book, John could also invite additional witnesses, although not "character witnesses." The only witnesses allowed to testify were those who met the University's definition of "witness to the incident," meaning a person who had contact with one of the parties "before, during or after the incident."  Whether a witness meets this criteria was a matter left to the sole discretion of the Hearing Panel.  But given that the allegations against John involved repeated contact with Jane, a person with whom he had an 18-month relationship, deciding precisely what comprised "the incident" presented a bit of a challenge to John. The notification letter also referred to the Red Book's provisions that an advisor is permitted to be present, but not allowed to "make comments, pass notes, or otherwise disrupt the Administrative Hearing or meetings" and that the parties could confer with their respective advisors during the hearing only on breaks, taken entirely at the discretion of the Hearing Panel.  [Def. Exh. 107 at 28.]

Additional documentation could be submitted by February 20, four days in advance of the hearing, and would be made available to the other side for review two

days before the hearing. Both John and Jane submitted additional documentation, but Jane's was a substantial volume of new material, which after being processed by OCS, John had two-and-a-half days to review before the Administrative Hearing. Ryan Willerton, the Director of OCS and member of the Hearing Panel, testified at the preliminary injunction hearing that John identified two additional witnesses who couldn't participate in person – one declined and the other, unable to attend due to travel plans, provided an affidavit that was considered.

After the Administrative Hearing, John requested a delay in its decision to allow him to try to obtain from Jane the full history of their text communications, and arguing that at the hearing Jane had made several false allegations for the first time, including allegations of sexual coercion. John advised Willerton that his efforts to obtain the text messages through a subpoena in the St. Joseph County proceedings had been thwarted by Jane's motion to dismiss the action, which John suggested was proof that Jane did not feel threatened by John and that the additional text messages would support his defense in the Notre Dame proceedings. Willerton responded that "[t]he Hearing Panel does not consider information submitted after the Administrative Hearing." [Pltf. Exh. 43, p.1.]

The Hearing Panel announced its decision in a March 20 letter, finding that John violated all four University Standards of Conduct that were identified in the administrative hearing notification letter. [Pltf. Exh. 9.] The decision letter is 16 pages in length and the majority of it is simply a series of quotes from the text messages that Jane

decided to send to the investigator. The full extent of the texts between John and Jane were never consider by the Hearing Panel. What's more, the Hearing Panel seems to have accepted at face value the following testimony from Jane which was quoted verbatim in the Decision Letter:

> "It was pretty much anytime that I was not doing what (John) wanted . . . he started to invade my physical safety. . . and made me feel very physically unsafe. Terrorized me. Frightened me. And threatened me multiple times. For instance, even starting in August, whenever I would not go to Chic-Fil-A with him. . .he would show up places. It was that level of if he (sic) did not do what he wanted me to do, he would terrorize me for the rest of the week. It happened repeatedly, and that is what bothered me the most.  Near the end of the relationship, I wasn't just worried he was just going to kill himself if I didn't do what he wanted me to do. . . I was worried that he was going to harm me. Show up in my apartment, or kill me, honestly. That was where my focus was at the end."

Decision Letter, DE 24-5 at 14.

John did not get an opportunity at the hearing to call this testimony into question.  He didn't have the text messages that the Court now has showing, at the very end of the relationship, that Jane was inviting John to Champaign, wanting to meet him in Chicago, having sleepovers, meeting him for lunch and telling him that she loves him. The Hearing Panel would reasonably have looked askance at Jane's testimony if it had this fuller picture of the relationship. At the very least this type of evidence certainly would have put Jane's testimony in a totally different light.  But John didn't have access to these texts messages because it was Jane who selectively chose which texts would be produced during the investigation.

In all events, John was immediately dismissed from the university through the Fall 2017 semester, with an opportunity to apply for readmission for the Spring 2018 semester. The notation "Dismissal with the Opportunity to Apply for Readmission" was placed on John's permanent academic record. The University forbade John from any contact—direct, indirect or through third parties—with Jane Roe for the remainder of his enrollment, and indicated that any contact would be considered if John applied for readmission. John was prohibited from entering any University-owned property.

Willerton testified that the dismissal decision was reached based on two factors. The first was that the behavior was a course of conduct in which John persisted even after Jane had told him it was abusive and harassing. The second was that John had suggested his suicide would be her fault. Dismissal with the opportunity to reapply reflected the conclusion that John understood the issues and could seek help to be able to return without posing any threat to the Notre Dame community.

John challenged the Hearing Panel's decision by appealing for a "case review" under Notre Dame's process. "Case review" is granted only on a finding that there's been a procedural defect or that there is new information substantial enough to change the outcome of the decisional process. John submitted two briefs in support of his request, making a number of arguments for reconsideration. Most significantly, John offered video clips of Jane, recorded February 12 on a friend's phone, just twelve days before she testified at the administrative hearing. In the video clips, which were played at the preliminary injunction hearing, Jane can be heard saying what her real intentions

were relating to the dispute with John: "I want to fuck up his reputation; I want him to never have a girlfriend here at Notre Dame or St. Mary's or anywhere; I want him to never be able to have a social life at St. Mary's or Notre Dame." This kind of admission would have seriously undermined Jane's testimony at the hearing.

In his appeal, John also addressed efforts by Jane to pressure potential witnesses not to support John in the proceedings, and how Jane had evaded production of the entire text history between them (which, as we now know, John had destroyed after receiving the No Contact Order). John offered new witness statements in response to serious allegations made for the first time by Jane at the Administrative Hearing, and argued that the Hearing Panel had refused evidence pertinent to Jane's credibility generally and her claims of feeling threatened by John. The Conduct Case Review Board issued a summary denial of case review, dated April 13, 2017, and at that point, John was formally removed from Notre Dame.

Heather Ryan testified that approximately 90% of the complaints Notre Dame receives in the sexual harassment category are by women against men, and that a portion of the 10% of complaints made by men are actually countercomplaints against women complainants. Mediation efforts are never attempted when sexual assault or other nonconsensual contact is alleged. According to Willerton, some universities are using a form of "restorative justice," especially in the context of dueling complaints by people in long term relationships. Notre Dame is currently researching and considering

this paradigm but the University has not yet employed that approach in its Title IX disciplinary process.

Willerton also testified that he could remember two situations in which female respondents were dismissed by Notre Dame as a disciplinary sanction. In one, a dating violence case, the woman had filed an initial report, there was a counter-complaint, and ultimately both students were dismissed. In the other matter, both parties were female. Willerton could not recall a single case in which a male complainant's charge of stalking or harassment or sexual violence resulted in the dismissal of a female complainant.

**Likelihood of Success on the Merits**

I will first consider John Doe's breach of contract claim. Under Indiana law, "the relationship between a student and an education institution is contractual in nature." *Chang v. Purdue University*, 985 N.E.2d 35, 46 (Ind.Ct.App. 2013) (internal quotation marks and citations omitted); *Gordon v. Purdue University*, 862 N.E.2d 1244, 1248 (Ind.Ct.App. 2007). *See also Sung Park v. Indiana University School of Dentistry*, 692 F.3d 828, 830-31 (7th Cir. 2012) (and cases cited therein). Because of the contractual nature of the relationship, a college obviously can't just throw a student out of school. Rather, there are duties conferred upon both the college and the student "which cannot be arbitrarily disregarded and may be judicially enforced." *Ross v. Creighton University*, 957 F.2d 410, 416 (7th Cir. 1992).

There are some actions taken by universities that are not cognizable in court. For example, "courts are not competent to hear claims that involve 'second-guessing the

professional judgment of the University faculty on academic matters." *Bissessur v. Indiana University Board of Trustees*, No. 1:07-CV-1290-SEB-WTL, 2008 WL 4274451 at *9 (S.D.Ind. Sept. 10, 2008), quoting *Ross*, 957 F.2d at 417. So, for example, students who are dismissed from a university for academic reasons can't run to court and claim their professor gypped them on a grade. But if the dismissal is for conduct other than poor academic performance—like the dismissal of John Doe—then it is subject to review. *Id*. It is also true that the contractual relationship between a student and a university is recognized to be a looser concept than contracts of other sorts. As one court put it, "The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Chang*, 985 N.E.2d at 46.

Notre Dame promises its students a "prompt, fair and impartial investigation and resolution" of disciplinary complaints involving sexual violence, stalking and dating violence. [DE 8-2 at 5.] This constitutes an "identifiable contractual promise that the defendant [allegedly] failed to honor." *Ross*, 957 F.2d at 417. The parties here agree that on a contract theory, the standard for reviewing the university's disciplinary actions is not *de novo*, but only to determine "whether the educational institution acted, illegally, arbitrarily, capriciously, or in bad faith." *Id*. at 47. And at this preliminary injunction stage, the question is only whether John Doe has a better than negligible chance of succeeding on his breach of contract claim to trigger consideration of his irreparable harm and other factors. *D.U.*, 825 F.3d at 338. Applying that standard, I readily find that John Doe has more than a negligible chance of prevailing on his

contention that Notre Dame's disciplinary process as applied in his case was arbitrary and capricious in a number of respects.

First, the lack of meaningful notice to John of the allegations against him, so as to be able to adequately prepare his defense, has a more than negligible chance of being found to render the disciplinary process capricious.  As shown above, this disciplinary matter was not, for example, the result of a sexual assault during a college hook-up or other single encounter between the complainant and respondent, but arose instead in the context of a long term relationship with literally hundreds of contacts between the parties.  To focus his defense, John reasonably needed to know what contacts and conduct was being scrutinized for possible violation of which policies.

At the beginning of Jane's formal complaint process, the University's November 29 letter merely advised John that "the incident alleged may be a violation of the University's policies related to sexual assault, sexual misconduct, dating and domestic violence, stalking, and/or conduct that creates a hostile environment."  [Def. Exh. 118 at 1.] This amounts to no notice at all.  It doesn't tell him what he is alleged to have done wrong nor when the wrongdoing was alleged to have taken place. Instead, it is merely general language parroting the laundry list of offenses identified on the cover of the University's Red Book on sexual harassment.  [Def. Exh. 107.] This so-called "notice of charges" could not be further from revealing particular policy violations implicated, much less specific allegations of John's objectionable conduct.

Later, the "administrative hearing notification letter" provided the most specific allegations of misconduct John would receive in the process, consisting only of a list of the four Standards of Conduct the Hearing Panel would determine whether John violated. But again, even at this juncture, with the hearing less than two weeks away, John was not put on notice of what he was alleged to have done that violated Notre Dame policy, and (important in the context of a long-term relationship) when he allegedly did it. The University points to John's access to the Investigative Summary Report ten days prior to the hearing. Although a sizeable volume of over 350 pages, its 18 page report from Investigator Kalamaros and 300+ pages of exhibits do not provide John with a statement of the particular conduct alleged to have been a violation of particular Notre Dame policies. And even if it did, ten days' notice might be found insufficient for this volume of material, particularly with John's graduation both at stake and on the immediate horizon.

Second, Jane's complaints were principally based on text communications between herself and John. Indeed, the 16-page Notice of Decision is largely a collection of those text messages. The University's investigation might have been arbitrary and capricious for failing to obtain and review the entire context of the couple's texting history. As described above, Jane has now produced to the parties in this litigation a much greater volume of text communications between herself and John, and acknowledges that this production contains more texts than were "produced in response to the processing of the Title IX matter by the University of Notre Dame" and

that "the University did not request the full extent of texts" between her and John.  [Pltf. Exh. 14 at ¶8.]

At least some of that additional texting history discloses Jane's voluntary engagement with John on the subject of his mental health taking place the very day before her initial meeting with Heather Ryan.  [Pltf. Exh. 17.] More generally, the larger texting history, as described in part above, might well have called into question Jane's credibility. She testified that John's communications were unwelcome, their contact was non-consensual, and that she felt intimidated or threatened by John. Yet the text messages that have been produced in this litigation but which were not available to the Hearing Panel—text messages showing sleepovers, naps together, invitations to go on trips, and lunch dates—strongly suggest that Jane did not feel threatened or intimidated by John.  [*See* DE 39 & 40.]

Third, the University's limits on hearing testimony—particularly the application of its narrow witness standard—might be found to be arbitrary or capricious in several respects.  In a disciplinary matter concerning behavior in a long-term existing relationship, context matters, and the motive of the complainant (as it relates to credibility) bears more scrutiny than in some other cases.  The Hearing Panel heard testimony from Jane and other witnesses about incidents in which John had angry outbursts in the past.  But what did that have to do with the charges?  Jane was essentially able to offer character evidence about John at the hearing. For example, the Hearing Panel elicited testimony about what John supposedly did when he was in New

York City the previous summer. But what was sauce for the goose was not sauce for the gander because John was prohibited from offering prior acts of Jane—what the University deemed inadmissible "character" evidence concerning her. The utter rejection of evidence shedding light on Jane's behavior, as relevant to her bias and credibility, including evidence that Jane had herself threatened suicide and had falsely claimed that John had violated the No Contact Order, might be thought to contribute to a process that was ultimately arbitrary or capricious in adjudicating John's responsibility for policy violations that cost him the remainder of his senior year, the conferral of his degree, his timely graduation and approximately $30,000 in tuition money.

Fourth, both Heather Ryan and Ryan Willerton testified that the focus of the disciplinary complaint process is on the respondent's behavior, to the exclusion of consideration of the respondent's mental health as a cause or mitigating factor. Unless a formal report was received requesting an accommodation on the basis of disability, John's depression could not be and was not taken into account in the disciplinary process. Based on the Hearing Panel's interpretation of the University's definition of a witness "to the incident," Notre Dame rejected the input of John's mental health counselor as to his progress in therapy. This is so even though the therapist would have had contact with John before, during, and after a number of incidents on which discipline was based.

Fifth, the significant "data dump" of Jane's supplemental materials (up to several inches thick) the week of the Administrative Hearing could be found to have contributed to a capricious process. John had two-and-a-half days to review the materials, and could only do so in the OCS office, without making copies. Such a process is not designed to facilitate a fair hearing for which John is fully prepared to respond against Jane's allegations and evidence. Similarly, the process can be criticized for its limitations on the examination of witnesses. That all questions must be proposed in writing and are asked of witnesses only at the discretion of the Hearing Panel does not permit a robust inquiry in support of a party's position. The stilted method does not allow for immediate follow-up questions based on a witness's answers, and stifles John's presentation of his defense to the allegations.

Sixth, at the Administrative Hearing, the accused student is essentially on his own. The actual presentation of the student's side of the case is left to the student himself, but with severe limitations. As noted, while he is permitted to have a lawyer or advisor present, those folks can't really do anything. They can't talk with the accused; they can't ask questions; they can't even pass notes to the accused. They are only permitted to consult with the students during breaks, given at the Hearing Panel's discretion. If, for example, a witness says something very inculpatory about the accused, and there is no break, the student can't talk with his advisor or lawyer about what he should ask the witness. And by the time the accused finally has a chance to talk with his advisor on a break, the witness could be long gone. When asked at the

preliminary injunction hearing why an attorney is not allowed to participate in the hearing especially given what is at stake—potential dismissal from school and the forfeiture of large sums of tuition money—Mr. Willerton, the Director of the Office of Community Standards and a member of the Hearing Panel, told me it's because he views this as an "educational" process for the student, not a punitive one. This testimony is not credible. Being thrown out of school, not being permitted to graduate and forfeiting a semester's worth of tuition is "punishment" in any reasonable sense of that term.

Seventh, many of these same concerns about the fairness of the disciplinary process were raised by John in his very substantive request to appeal the decision by "case review." These include the unfairness of consideration only of Jane's cherry-picked text messages (and Jane's efforts to avoid production of the entire text history) and the Hearing Panel's refusal of evidence pertinent to Jane's credibility and state of mind (whether she in fact felt threatened by John). The conclusory and dismissive denial by the Conduct Case Review Board may contribute to an ultimate finding that Notre Dame's process was arbitrary or capricious especially since it refused to take into consideration Jane's statement on video that her true motive in her charges against John was to "fuck up his reputation" so as to ensure that he will "never be able to have a social life."

Eighth, the Red Book sets out a goal of concluding each disciplinary complaint within 60 days from initial report to decision. [Def. Exh. 107 at 23.] Jane's formal

complaint initiating the investigation and hearing process occurred on November 29. The Hearing Panel's decision dated March 20 was issued 111 days later, roughly six weeks before final exam week was set to begin. This delay, and the timing of such a drastic disciplinary action, might factor into a determination that the process was conducted in an arbitrary and capricious manner. In contrast, the proceedings on John's complaints against Jane evidently remain pending and it appears that they won't have an impact on Jane's degree or graduation. If all the related matters had been combined for consideration, John would have had the benefit of his allegations reflecting on Jane's credibility being considered at the same time as her allegations against him, and (if conducted on the timetable of the remaining proceedings) the combined proceedings would not have potentially impacted his graduation either.

Of course, all conclusions about the merits are conjectural at this point, and do not predict ultimate victory for John Doe. But it has been shown by the evidence and argument submitted that a jury could conclude that the disciplinary process was conducted in an arbitrary and capricious manner, and that Notre Dame breached its promise to provide John with a prompt, fair and impartial investigation and resolution of Jane's complaint. Because I find that John demonstrates some likelihood of success on the merits of his breach of contract claim, I do not proceed to consideration of the merits of his Title IX claim.

## Irreparable Harm and the Adequacy of Legal Remedies

Preliminary injunctive relief requires a demonstration that John will suffer (and that the injunction sought will address) irreparable harm that will occur in the period before the case is decided on the merits. *Jones*, 842 F.3d at 1058. John argues that his "dismissal . . . from the University only weeks before his graduation, and after he has invested tens of thousands of dollars in his education, constitutes irreparable harm." [DE 9 at 25.] He further contends that "[i]f the University maintains the sanction of immediate dismissal, John will have an incomplete for all of his courses this semester and will be forced to repeat his entire final semester when he re-applies next spring, assuming he is even accepted...Without [the preliminary injunction], even if John were to ultimately prevail in this lawsuit and have the finding of responsibility reversed, he would still need to repeat his final semester." [DE 37 at 2.]

Other courts have found similar circumstances to constitute irreparable harm:

> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career....Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury College*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D.Vt. Sept. 16, 2015). Similarly, a preliminary injunction was granted against DePauw University after a judge was persuaded that the plaintiff would suffer irreparable harm if "not permitted to complete this upcoming semester" because the gap created in his record

would make it "inevitable that he would be asked to explain [the] situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw." *King v. DePauw University*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D.Ind. Aug. 22, 2014). *See also Ritter v. Oklahoma*, No. Civ.-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 at *8 (W.D.Okla. May 6, 2016) (plaintiff seeking a TRO demonstrated that the "loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages").

*Middlebury* and *DePauw* both present circumstances in which the student-plaintiff obtained an injunction in time to permit him to return to his university in the fall and complete the entire school year, and so to avoid entirely a gap in his education during the pendency of the litigation. An injunction requiring a university to allow a student to return for an entire school year strikes me as a much greater burden to the university than what is being requested here—the taking of two final examinations.

What's more, because of the timing of the University's discipline here, avoiding a gap in John's educational career is even more difficult. The pendency of the litigation inevitably creates a gap in John's education, as he was dismissed from the University just short of completing the semester and without an undergraduate degree. As noted, John has indicated, without contradiction by the University, that only two remaining courses (which were interrupted by his dismissal) are necessary for his degree requirements. [DE 9 at 5.] Even if John prevails in this case and the disciplinary

dismissal is set aside by the final relief awarded, in order to earn his degree John would still be required to interrupt his career, return to South Bend and retake the two courses necessary for his degree. This would extend the unavoidable gap in John's academic career represented by the pendency of this lawsuit.

I am persuaded that this gap constitutes irreparable harm to John's reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in John's favor. To repeat, the preliminary relief John seeks is very narrow—an injunction that he be allowed to take two exams—and is appropriate to minimize the consequences of the irreparable harm attributable to the pendency of the lawsuit, if John meets the other requirements for preliminary injunctive relief.

John also represents that being unable to take the two exams "will have an immediate impact on his post-graduation employment" and that he will "risk losing a lucrative employment position set to begin in June 2017." [DE 9 at 5, 6.] John has told me, without contradiction from Notre Dame, that he will be able to start his job in June if he completes his course work even if his degree is not conferred. The financial component of this harm, while significant, is not irreparable or incapable of being addressed by money damages. But what is irreparable is the fact that if an injunction is not issued, no matter what he chooses to do after leaving South Bend, he will need to

interrupt it to return to Notre Dame next spring for four months to repeat the workload that he has already nearly completed this year. He will be putting his life on hold and will have a lot of explaining to do to future employers and potential graduate schools.

**Balance of the Harms**

Although the injunction sought here is a mandatory or affirmative injunction, it is not the case that "the hardships of the contemplated injunction would fall disproportionately on" Notre Dame. *Kartman*, 634 F.3d at 892. To administer two exams to John Doe is a modest requirement, it presents no logistical burden to Notre Dame and is virtually costless to the institution. And because the balance of the disciplinary sanction will remain in place—his dismissal from the campus, the non-conferral of his degree this Spring, and his exclusion from graduation with his class—it is hyperbole to suggest, as the University does, that the proposed injunction would leave the disciplinary sanction "*without meaningful consequence.*" [DE 36 at 2 (emphasis in original).] That strikes me as an absurd overstatement since John will still not have his degree.

The remaining components of the University's discipline are far from toothless. Notre Dame's interest in the conclusiveness of its disciplinary process is not undermined in advance of a final decision in this litigation, even if Notre Dame wins and the discipline is upheld. For the same reason—this is limited relief from the overall sanction—I don't believe that the University suffers particularly significant harm in terms of a chilling effect on potential future complainants.

On the other hand, if John prevails and the discipline is reversed, to deny the limited relief he seeks now would impose a significant extension of the hardship he suffers by a wrongful dismissal interrupting his senior year at the 11th hour. In the absence of the injunction, John's ultimate success in the litigation would still require him to re-take two courses in order to obtain his degree, imposing a further gap in his record that would (as previously discussed) subject him to reputational and career hardships. In sum, the balance of harms weighs heavily in John's favor. *See Ritter*, 2016 U.S. Dist. LEXIS 60193 at *8 (the grading of a test and master's thesis, while not small tasks are "inconsiderable in comparison to the threatened injury to plaintiff if he was wrongly expelled").

The public interest does not weigh against the relief John seeks. The public has an interest in fundamentally fair and sound educational discipline that is not imposed arbitrarily or capriciously. The minimal step taken in the proposed injunction to prevent the exacerbation of harm to John during his litigation challenging that fairness, while leaving in place significant ramifications of the discipline already imposed, is not contrary to the public interest. The public also has an interest in the safety of students on university campuses. There is no suggestion (nor could there be) that the limited relief of permitting John to take two exams, which can at the University's option be administered off-campus, endangers Jane or any other Notre Dame student.

## Conclusion

I am persuaded to grant the limited preliminary injunctive relief sought by John Doe. The injunction is supported by John's showing of at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm. The balance of the harms and the inadequacy of legal relief weigh in favor of the issuance of the injunction, and the public interest is not averse. The University will be ordered to permit John to sit for the two final examinations, which may be administered off-campus at the University's option, at a time and place mutually and reasonably agreed upon by the parties. The exams are to be graded, so that the ability for the course's professor to grade them along with the rest of John's class will not be lost. Otherwise, all terms and ramifications of the disciplinary decision remain in place, including John's exclusion from campus and the withholding of his degree. The University has not requested that any security be posted in the event the injunction is granted, and has not identified any costs to be incurred if Notre Dame is wrongly enjoined. I find that no bond is necessary under Rule 65(c).

**ACCORDINGLY:**

Plaintiff John Doe's Corrected Motion for a Temporary Restraining Order and Preliminary Injunction [DE 8] is GRANTED.

Defendant University of Notre Dame and its officers, agents, servants, employees, and attorneys are hereby RESTRAINED AND ENJOINED as follows:

Defendant shall permit John to take his final examinations, which may be administered off-campus at the University's option. The parties are to confer in good faith to reasonably agree upon a time and place for the exams to be administered. The exams are to be graded, and John's final grades computed. The University's disciplinary decision may remain in place in all other respects. Therefore, John's degree can be withheld, he must continue to stay off of Notre Dame's campus and he is banned from participating in commencement.

Defendant is ORDERED to preserve and retain all documents and electronically stored information potentially relevant to the claims in the Verified Complaint, including the audio recording of the Administrative Hearing.

The Court FINDS that no compensable harm will result to Defendant as a result of this Order, and, therefore, the Court declines to assess any surety bond.

This Order is effective immediately.

**SO ORDERED**.

ENTERED: May 8, 2017

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**